BRIDGKORT RACQUET CLUB, INC., Plaintiff-Respondent, v.
UNIVERSITY BANK, Defendant-Appellant.†

Court of Appeals, District III

*No. 77–510.  Submitted on briefs September 12, 1978.—
Decided October 13, 1978.*
(Also reported in 271 N.W.2d 165.)

† Petition to review denied.

For the appellant the cause was submitted on the brief of *Charles H. Wheeler* and *Schmeling, Muraski & Wheeler,* of Green Bay.

For the respondent the cause was submitted on the brief of *Bittner, Petitjean, Hinkfuss & Sickel,* of Green Bay.

Before Dean, P.J., Donlin and Foley, JJ.

FOLEY, J.   The respondent, Bridgkort Racquet Club, Inc. was formed in 1975 to build an indoor athletic facility in Neenah.  In August and September, 1975, Bridgkort received loan commitments from several lending institutions including the appellant, University Bank, in order to finance construction.  The commitments were in varying amounts totaling $1,050,000, with the defendant Bank agreeing to loan plaintiff $250,000 at $10\frac{1}{4}$% over 15 years.[1]   Home Savings & Loan of Appleton had meanwhile agreed to be the lead lender and had extended an interim loan for $1,050,000 to cover costs arising dur-

---

[1] We are unable to discover why $10\frac{1}{4}$% was the interest figure used at trial by both parties, as the figure stated in the Bank's loan commitment was $10\frac{1}{8}$%.  We accept $10\frac{1}{4}$% as the rate of interest here but note our awareness of the possible mutual mistake of counsel in arguing the figure.

ing construction and prior to the closing date of the final loan.

Closing occurred January 12, 1976. No representative of the Bank came to the closing, but there was no other indication that the Bank did not intend to honor its commitment. Not until January 23 did Bridgkort learn definitely that the Bank was not going to make the loan.

After Bridgkort tried and failed to obtain a substitute loan from some 25 different lending institutions, Home Savings finally agreed to lend Bridgkort the $250,000 amount at the increased interest rate of 11%, also for 15 years.

Bridgkort brought this suit against the Bank for breach of contract for failing to make the 10¼% loan. The Bank answered by alleging their failure to make the loan was justified by Bridgkort's failure to substantially perform its part of the contract by the closing date. Following a jury verdict in favor of Bridgkort, the court entered judgment against the Bank for $20,988, representing the additional interest costs to Bridgkort of the 11% loan over 15 years, plus $2,500 for return of the 1% loan fee paid by Bridgkort and $500 for attorney fees incurred in negotiating a substitute loan. The Bank has appealed from the entire judgment but does not challenge the amounts of the loan fee or attorney fees.

Three issues are raised on this appeal:

1. Was there sufficient credible evidence to support the jury verdict finding Bridgkort was prepared to substantially perform the contract on January 12, 1976?

2. Did the trial court err in submitting one special verdict question to the jury rather than separate questions as to each of Bridgkort's alleged failures to perform conditions required by the contract?

3. What is the proper measure of damages sustained by Bridgkort?

The Bank argues that the evidence showed Bridgkort failed to substantially perform three conditions of the contract. These were:

1. Failure to obtain signatures of all seven personal guarantors by January 12, 1976.

2. Failure to provide satisfactory title insurance by that date.

3. Failure to provide satisfactory fire and extended coverage insurance, also by the same date.

The trial court on motions after verdict rejected these arguments. We believe the trial court was correct.[2] There was credible evidence in the record to support the finding that Bridgkort was prepared to provide substantial performance by January 12 of each of the three conditions the Bank contended were not met.[3]

Substantial performance means not doing the exact thing promised, but doing something else that is just as good, or good enough for both obligor and obligee.[4] In the instant case the concern is not with what was substantially performed prior to January 12, but what Bridgkort was prepared to do by or on that date. *Gonis*

---

[2] 805.14(1) TEST OF SUFFICIENCY OF EVIDENCE. No motion challenging the sufficiency of the evidence as a matter of law to support a verdict, or an answer in a verdict, shall be granted unless the court is satisfied that, considering all credible evidence and reasonable inferences therefrom in the light most favorable to the party against whom the motion is made, there is no credible evidence to sustain a finding in favor of such party.

[3] The special verdict question assumed that time was of the essence. Otherwise, the question of substantial performance by January 12 would be irrelevant and the Bank clearly would not have been allowed to rescind. For purposes of deciding this appeal, we do not question the assumption that time was of the essence, and instead treat it as a conclusion of law, not in issue here. As is obvious by the opinion, this approach is significant not to the outcome of the appeal, but only to the reasoning behind it.

[4] 17A C.J.S. *Contracts* sec. 508 (1963).

*v. New York Life Ins. Co.,* 70 Wis.2d 950, 960, 236 N.W. 2d 273, 278 (1975). Thus the focus is not on what Bridgkort actually did but what they could have done had the Bank attended the closing and made known its objections.

Testimony revealed that only five of the seven personal guarantors had signed a pledge as of January 12. With only this fact we would hold there was no substantial performance as the Bank was clearly entitled to have its full security. However, there was testimony that the unsigned guarantors were contacted by telephone on January 12 and indicated their willingness to sign either that day or the next. From this the inference is reasonable that had the Bank been present at the closing, and had it communicated its dissatisfaction with two guarantors signing late, Bridgkort could have produced the remaining signatures that day. Under *Gonis, supra,* this would have been timely performance. (The remaining two guarantors did sign within the week.)

Regarding the title insurance policy, the commitment provided on January 12 excepted potential construction liens. Lien waivers had been obtained. However, the Bank argues that the commitment, coupled with the lien waivers obtained from the subcontractors, was an insufficient substitute. We agree. However, it is not what actually existed as of January 12, but what could have been provided. The attorney for the lead lender, who was also an owner of the title insurance company issuing the policy for this transaction, testified that the lien waivers were obtained for the purpose of issuing a title policy without the construction lien exception. He stated that he was willing to provide such a policy to the Bank. He was present at the closing. The inference is firmly supported that had the Bank attended the closing and made known its objection, Bridgkort could have provided a satisfactory title policy commitment. Such a commit-

ment would have been substantial performance of the title policy condition.

Regarding the fire and extended coverage insurance, there was in existence on January 12 a policy insuring Home Savings & Loan for $1,050,000. This policy had been issued in September to protect Home Savings as the interim lender on Bridgkort construction. In addition, there was a letter from the insurer's agent addressed to a Home Savings officer notifying him of the insurer's commitment to continue coverage once a permanent loan was arranged.

It is disputed whether this letter constituted a binder, committing the insurer to provide coverage to the Bank once it became a permanent lender. The Bank's objection is that the letter did not mention it by name, nor state any amount of coverage. Here again, if what existed was insufficient, it is reasonable to infer that any deficiencies could have been cleared on the day of the closing with a specific formal binder from the insurance company's local office.

In addition, University offered no evidence contradicting the testimony that Bridgkort acted in good faith throughout the transaction. Thus we find the record sufficient to support the jury's determination that Bridgkort was prepared to substantially perform its part of the contract on January 12.

The Bank also appeals the trial court's overruling of its objection to the form of the special verdict. It had asked the trial court to substitute questions dealing individually with each of the conditions Bridgkort was required to perform by its contract with the Bank.[5] Uni-

---

[5] The question asked was: "At the time of the closing on January 12, 1976, was the plaintiff prepared to perform substantially the conditions of the contract?"

versity argues that the form of the question submitted may have led the jury to misconstrue the substantial performance test, applying it quantitatively rather than determining substantial performance of each condition. We approve the trial court's submission of a single question on substantial performance and find no error in the form of the special verdict. The trial court has considerable discretion in framing the special verdict and its decision will not be reversed on appeal if the material issues of fact are addressed. *Wisconsin Builders, Inc. v. General Ins. Co. of Amer.*, 65 Wis.2d 91, 221 N.W.2d 832, 838 (1974).

The material issue was substantial performance and it was satisfactorily addressed by the special verdict question and the instructions. It would be speculation for us to conclude that the jury applied a wrong test. Furthermore, the question of Bridgkort's performance of each of the disputed conditions was extensively litigated during the trial. Thus, it is reasonable to conclude that the jury was aware of the importance of performing every material condition, and thus considered the performance of each individually.

Additionally, once the Bank became aware of the form of verdict to be used by the trial court, it could have handled its concern of possible jury misunderstanding by requesting additional instructions. This was not done and there was no objection to the instructions as given.

## MEASURE OF DAMAGES

Bridgkort contends that the proper measure of its damage is the difference between the interest it will pay on the loan it wrote at 11% and the loan it should have had from the Bank at 10¼%. The difference is ¾ of a percent over 15 years on the $250,000. It is conceded that this amount was $20,988. The Bank argued that the

proper measure was the present value of $20,988 and submitted as an offer of proof the figure of $8,632. This figure supposedly represented the amount which, if invested at 7% for 15 years, would generate a total principal and interest sum of $20,988. The court rejected the offer of proof and no evidence on present value was submitted to the jury although the court did give an instruction similar to the Wisconsin Civil Jury Instruction on present value.[6]

After the verdict awarding Bridgkort $20,988, the trial court concluded that it erred in rejecting the Bank's offer of proof. It set aside the verdict and applied the rule of *Powers v. Allstate Insurance Co.*, 10 Wis.2d 78, 102 N.W.2d 393 (1960), and offered Bridgkort the choice between a $12,000 award or a new trial on damages. After a hearing and submission of briefs on the matter, the trial court again reversed itself and reinstated the verdict.

We recognize that the measure of damages allowed in actions for breach of contracts to loan money is the difference in the cost incurred in obtaining a substitute loan at an increased interest rate. *Lloyd Investment Co. v. Illinois Surety Co.*, 164 Wis. 282, 160 N.W. 58 (1916); *Restatement of Contracts*, sec. 343 (1932). Bridgkort argues that this standard precludes using the present value concept. It relies on *Repinsky v. Clintonville Federal Savings & Loan Assn.*, 49 Wis.2d 53, 181 N.W.2d 351 (1970), where the court allowed as damages the total cost of obtaining a substitute loan, not reduced by any present value calculation.

---

[6] Wis. J.I. Civil 1796 is the present value instruction. The comment accompanying the instruction cites examples of when the instruction is ordinarily required. The examples cited deal with tort cases and no reference is made to application to a contract case.

We conclude that the present value concept does apply to an action for breach of contract to loan money where the claimed damage is increased interest payments to be made in the future. This requires that the judgment be reversed and the case remanded.[7]

We disagree with Bridgkort's argument and find no conflict between our holding and *Repinsky*. There the issue of present value was not addressed. Therefore we cannot say that the court would have rejected the use of present value if the defendant had argued for its application. We are not required to base our decision in this case on what the supreme court did not do on an issue not before it.

In Bridgkort's case, the total cost, $20,988, does not accrue until the end of 15 years. Granting judgment for that amount at the beginning of the 15-year period would allow Bridgkort to gain 15 years of beneficial use of the money in addition to full compensation for the loan. This would violate the elementary rule of contract damages that a party complaining of loss is only entitled to be placed in the same position as if the breach had not occurred. *Pleasure Time, Inc. v. Kuss,* 78 Wis.2d 373, 254 N.W.2d 463 (1977).

Having decided that Bridgkort is only entitled to the present value of its loss, the problem remains of how to determine what that amount is. We think the best approach is to use the *Powers, supra,* option, whereby the court gives plaintiff the choice of accepting what it believes is a reasonable amount, or retrying the damages question. While *Powers* was a tort case, the court's

---

[7] We have been able to find only one case discussing the application of the present value concept to breaches of contracts to loan money. See *Financial Federal Savings & Loan Assn. of Dade County v. Continental Enterprises, Inc.,* 338 So.2d 907 (Fla. App. 1976). There the court also found the present value concept applicable.

power in contract cases to adjust the damages downward or to grant a new trial at plaintiff's option was established very early in Wisconsin. *Nudd v. Wells,* 11 Wis. 407 (1860); *Corcoran v. Harran,* 55 Wis. 120, 12 N.W. 468 (1882).[8] While *Powers* permitted such action only if no errors of law had occurred at trial, that limitation has since been removed. *Spleas v. Milwaukee & Suburban Transport Corp.,* 21 Wis.2d 635, 124 N.W.2d 593 (1963).

In this case we accept as a fair and reasonable present value the $8,632 figure proposed by the Bank. Its witness testified that this figure compounded at 7% resulted in approximately $20,988 in 15 years.[9]

We therefore reverse and remand to the trial court with the direction that Bridgkort have the option to take

---

[8] "We must therefore hold that, *in actions of tort as well as contract,* where the damages are clearly excessive, the trial judge may either grant a new trial absolutely, or give the plaintiff the option to remit the excess . . . ." (Emphasis added.) *Corcoran v. Harran, supra,* 55 Wis. at 127.

[9] We disagree with this computation. Our figures indicate that $8,632 compounded quarterly at 7% results in a 15 year total of $24,500. Nevertheless, $8,632 is a reasonable figure. There is nothing sacred about the 7% interest rate return. It may be that Bridgkort's choice might be to invest the money at a lower return rate. Or it may be able to obtain even a higher rate of return. Obviously, precision in present value computation is impossible. If the figure is somewhat high it is, after all, the one suggested by the respondent and fairness suggests that the Bank ought now to be prepared to live with it. If Bridgkort believes it is too low, it may elect the opportunity to convince a jury of that belief. In this opinion we have accepted the figure of $20,988 as Bridgkort's loss. As noted, this figure represents the extra cost at the end of 15 years of the 11% loan. By our acceptance of this figure we do not imply that it is the proper measure of the loss sustained by Bridgkort because Bridgkort does not pay this sum at the end of 15 years. It instead must make these payments in equal monthly installments over the 15 years.

judgment in the amount of $8,632 in addition to costs and the other damages awarded in the trial court's judgment. Bridgkort shall have 20 days to exercise this option in writing after return of the record to the trial court. If Bridgkort does not elect to take judgment within 20 days, the trial court shall enter an order for a new trial on the issue of damages.

*By the Court.*—Judgment affirmed in part and reversed in part and remanded.