T. A. PIPKIN, D. J. DUDLEY, P. M. WILLIAMS, AND MACK DONALD WEEKS, INDIVIDUALLY AND TRADING AS P.W.D. & W., A NORTH CAROLINA GENERAL PARTNERSHIP v. THOMAS & HILL, INC.

No. 104

(Filed 17 October 1979)

**Contracts §§ 29.2, 29.3— breach of contract to make long-term loan—special and compensatory damages**

Where defendant lender breached a commitment to provide long-term financing for plaintiffs' motel construction project, a substitute loan was unavailable upon any terms at the time of the breach, and, in order to forestall foreclosure, plaintiffs had to refinance their construction loan by a demand note at a fluctuating rate of interest which was higher than that called for by defendant's commitment, plaintiffs are entitled to recover the following special and compensatory damages for defendant's breach of the loan commitment; (1) amounts which they expended for additional title insurance and for brokerage, accounting and appraisal fees in refinancing their construction loan and in their unsuccessful attempts to secure a substitute long-term loan; (2) the interest plaintiffs have paid on the demand note between the date of defendant's breach of its commitment and the date of trial, less the amount of interest plaintiffs contracted to pay defendant between those dates; and (3) the present value of the difference between the interest payments at $9\frac{1}{2}\%$ per annum which would be owed under the contract between the date of the trial and the end of the credit period and interest which would have been paid during the same period for a loan bearing interest at $10\frac{1}{2}\%$ per annum, the rate found by the trial court to be the lowest prevailing rate of interest on the date of the breach for a long-term commercial loan.

ON discretionary review of the decision of the Court of Appeals reported in 33 N.C. App. 710, 236 S.E. 2d 725 (1977), which modified the judgment of *McKinnon, J.*, entered 26 May 1976 in the Superior Court of WAKE, docketed and argued as Case No. 113 at the Fall Term 1977 of this Court.

Plaintiffs, as individuals and general partners doing business under the name of P.W.D. & W., brought this action for damages against defendant, a West Virginia corporation engaged in the mortgage banking business, to recover damages for its breach of an alleged contract to make plaintiffs a long-term loan to repay a construction loan from Central Carolina Bank (CCB). Defendants denied the contract, and the case was tried at the 29 March 1976 session before Judge McKinnon without a jury. The essential facts, as found by the trial court and stated in his judgment, are supported by the evidence and are not now in dispute. In brief summary the pertinent facts are set out below.

Defendant maintained a branch office in Greensboro, North Carolina, from 2 August 1971 until 15 April 1974. During this time, Mr. O. Larry Ward (Ward), then an assistant vice-president of defendant corporation, was the manager of this office. Ward was equipped with and authorized to use stationery and business cards bearing defendant's name and his own name and corporate titles. He was also authorized to solicit loan applications from prospective borrowers, but he did not have actual authority to issue permanent loan commitments. However, no notice of this limitation upon Ward's authority appeared anywhere, and plaintiffs were unaware of it until August 1974.

In August 1972 plaintiffs acquired property on U. S. Highway 70 and 401 just south of Raleigh for the purpose of constructing and operating a motel and restaurant. At that time they were experienced business men but inexperienced real estate developers. After extended negotiations with Ward, on 19 April 1973 plaintiffs jointly and severally filed with him, on a form furnished by defendant, an application for a "long-term permanent loan commitment from the defendant" in the amount of $1,162,500, repayable over 25 years at an interest rate of nine and one-half percent (9½%) per annum, with monthly payments of $10,156.76 for amortization of principal and interest. Plaintiffs' application was accompanied by a check for $500, the specified application fee.

At the same time plaintiffs were negotiating with Ward they were also negotiating with CCB for a loan in the amount of $1,162,500 to finance construction of the motel-restaurant project. As a condition for making the construction loan CCB required that plaintiffs obtain a permanent loan commitment in the same amount "to provide a payout of the construction loan upon the completion of construction." Mr. Weeks, one of the plaintiffs, introduced Ward to Mr. Scott Edwards, an assistant vice-president of CCB and the manager of its Credit Department. Edwards told Weeks that he would check out defendant's financial situation. After doing so he told Weeks he was satisfied with it and would make the construction loan based on its permanent commitment.

Mr. Edwards testified that he told Ward from the beginning that CCB would not make plaintiffs a construction loan until plaintiffs had secured a commitment for a long-term loan with which to

repay CCB at the time construction was completed, and that Ward assured him defendant would itself "take the loan out of the bank" if it had not found a permanent lender when the construction loan became due. Mr. Edwards further testified that his investigation of defendant corporation led him to believe it "had an honorable reputation among West Virginia banks . . . and had financial strength . . . to fund this loan out of its own resources at the appointed time if they had not brought another lender into the picture."

On 7 June 1973 Ward received word from defendant's home office in Charleston, West Virginia, that defendant had been unable to place plaintiffs' application with a permanent lender. Notwithstanding, on 11 June 1973, Ward wrote Edwards a letter in which he committed defendant to make the long-term loan plaintiffs had requested. A copy of this letter was sent to each plaintiff. In pertinent part this letter said:

"Thomas & Hill, Inc., is processing an application for a permanent loan for Mr. P. M. Williams, Mr. D. J. Dudley, Mr. Thomas A. Pipkin, and Mr. McDonald (sic) Weeks, on the above property.

"Please accept this letter as our commitment to fund the permanent loan on or before September 1, 1974, in an amount of $1,162,500.00, as outlined in the loan submission mailed to you May 24, 1973."

Thereafter, Edwards mailed Ward documents detailing the terms of CCB's construction loan and asked that these terms be incorporated into defendant's letter of commitment. On 27 June 1973 Ward replied as follows:

"Please accept this letter as our commitment to fund the permanent loan on or before October 1, 1974, in an amount of not less than $1,162,500.00 as outlined in my loan package submitted to you on May 24, 1973.

"Please be further advised that your commitment dated June 26, 1973, for the construction loan is hereby made a part of our commitment to the borrowers and is attached as Exhibit A."

Again each plaintiff received a copy of the correspondence. At that time Ward and plaintiffs agreed that defendant would receive a fee of $11,625 for the loan commitment and a fee of $11,625 for closing the loan, a total of $23,250.

Relying upon defendant's commitment to make the permanent loan, on 2 July 1973 CCB and plaintiffs executed a construction loan agreement in the amount of $1,162,500, at 9% interest per annum, payable on 1 October 1974 or at the closing of the long-term permanent loan, whichever occurred first. The construction loan was closed in August 1973. Thereafter plaintiffs utilized the entire loan of $1,162,500 in building the motel and restaurant, except for $23,250 representing the fees due defendant upon the closing of its loan to plaintiffs. Upon Ward's instructions, and with plaintiffs' consent, CCB held this sum in an escrow account for defendant.

The motel was completed on 8 July 1974. When it became apparent in May that construction would be finished well in advance of October, Mr. Edwards then attempted to contact Ward to ascertain if defendant would be interested in taking the construction loan out of CCB earlier. At that time he learned that defendant had closed its Greensboro office, and that Ward could not be located. On 9 May 1974 Edwards took the matter up with defendant's home office in Charleston, West Virginia, informing its officers in detail of all dealings which plaintiffs and CCB had had with Ward with reference to the loan in suit. However, it was not until 6 August 1974 that defendant repudiated the loan commitment Ward had made to plaintiffs and to CCB. On 27 August 1974 in a letter to CCB's attorney, defendant's president stated that Ward had no authority to issue the loan commitment and that the defendant would not honor the commitment.

Immediately upon receiving notice that defendant had repudiated the loan commitment the plaintiffs, assisted by CCB, began a diligent and exhaustive search for alternative permanent financing. They found that no such loans were available at any rate of interest. All the evidence tended to show that it had become extremely difficult to obtain commerical loans of any type and motel loans were almost nonexistent; that had such money been obtainable, it would have been at a very high rate, the best terms being a "10½% rate for 20 years with a 25-year amortization schedule at seven discount points."

After the completion of construction plaintiffs' motel-restaurant project was appraised at $1,790,000. This gave plaintiffs a net equity, over and above the $1,162,500 construction loan, of $627,500.

On 1 October 1974, to forestall foreclosure, CCB required plaintiffs to refinance their construction loan by "executing a new deed of trust" and "a six-month demand note" for $1,162,500, bearing a variable interest rate of 2% above CCB's prime. On 1 January 1976 CCB increased the interest payments on the loan to three percent above its prime rate. Between 1 October 1974 and the date of the trial, 31 March 1976, plaintiffs had paid CCB $184,619.49 in interest. No payments had been made on the principal of the loan. During the same 18 months, in attempting to obtain another long-term loan, plaintiffs incurred the following "reasonable expenses," totaling $5,888.12: (1) $1,613.12 for title insurance required by CCB; (2) $3,000 in additional brokerage fees; (3) $1,025 for extra accounting expenses; and (4) $250 for an updated MAI appraisal. Despite their diligent efforts, and the efforts of CCB, plaintiffs had not been able to arrange alternative, long-term financing at the date of the trial. Plaintiffs demonstrated and the trial court found, however, that the lowest prevailing rate of interest on comparable commercial loans on 1 October 1974 was $10\frac{1}{2}\%$ per annum.

On the basis of his findings of fact, all of which are supported by competent evidence, Judge McKinnon concluded (1) that although Ward did not have actual authority to obligate defendant to make a loan to plaintiffs, he nevertheless "had apparent authority to bind the defendant to a contract"; (2) that plaintiffs, who had no notice of Ward's lack of such authority, had reasonably relied upon his apparent authority to commit defendant to make them the loan for which they had applied; (3) that in June 1973 plaintiffs and defendant had entered into a contract, duly supported by consideration, which embodied the terms of plaintiffs' loan application; and (4) that defendant had breached this agreement.

Judge McKinnon then adjudged that "the plaintiffs [had] sustained and [were] entitled to recover past, present, and prospective damages as follows": $5,888.12 for the additional expenses incurred in searching for an alternative lender; (2) $120,000, "representing the present worth of the reasonable additional cost to the plaintiffs of a loan at the lowest prevailing rate of interest on 1 October 1974, after also being duly discounted for the likelihood of early payment." Judgment was entered in favor of plaintiffs for $125,888.12 with legal interest from the date of judg-

ment. No recovery for the interest plaintiffs paid CCB between 1 October 1974 and the date of trial was allowed.

The explanation for judgment item (2) above ($120,000) appears to be the following: Dr. J. Finley Lee, a professor of business administration specializing in economics, insurance, and statistics at the University of North Carolina, was qualified as an expert in calculating the present economic value of monetary payments to be made in the future. He testified that the difference between the cost of the agreed loan in the amount of $1,162,500 repayable over 25 years with interest at 9½% per annum and the cost of a similar loan at 10½% per annum was $245,805. He determined the present cash value of that sum to be $143,282.03, a figure which Judge McKinnon evidently reduced by $23,282.03 "for the likelihood of early payment," thereby obtaining the amount of $120,000.

Upon defendant's appeal and plaintiffs' cross appeal the Court of Appeals affirmed the judgment of the trial court insofar as it imposed liability on defendant for breach of contract. However, the Court of Appeals modified Judge McKinnon's award of damages in two respects: It held that plaintiffs were entitled to recover (1) the $184,619.49 in interest which they had paid CCB from 1 October 1974 on the demand notes until the date of the trial and (2) the full present cash value of the difference between the cost of the agreed loan at 9½% interest per annum and 10½% interest for 25 years, $143,282.03, without any reduction "for the likelihood of early prepayment."

We allowed defendant's petition for discretionary review for the sole purpose of considering what damages plaintiffs are entitled to recover for defendant's breach of contract.

*Manning, Fulton & Skinner by M. Marshall Happer III, and Charles L. Fulton, for plaintiffs.*

*Smith, Anderson, Blount & Mitchell by H. A. Mitchell, Jr., and Michael E. Weddington, for defendant.*

SHARP, Chief Justice.[1]

Initially, the primary relief which plaintiffs sought in this action was a decree ordering defendant to specifically perform its

---

1. This opinion was written in accordance with the Court's decision made prior to the retirement of Chief Justice Sharp and was adopted by the Court and ordered filed after she retired.

---

---

commitment to provide long-term or "permanent" financing to enable plaintiffs to take up CCB's interim construction loan on their motel-restaurant project. Historically, courts of equity refused to decree specific performance of a contract to lend money on the ground that the disappointed borrower could be fully compensated by damages because, presumably, money could always be found elsewhere.[2] More recently, however, courts have employed the equitable remedy of specific performance when the circumstances of the particular case demonstrate the inadequacy of money damages to afford appropriate relief.[3] In this case the parties' stipulation that defendant is financially unable to comply with its contract rendered the availability of the remedy of specific performance immaterial. Plaintiffs, therefore, are relegated to such damages as they are legally entitled to recover, and are able to collect, from defendant.

A borrower's claim for damages resulting from a lender's breach of a contract to lend money is primarily circumscribed by the rule of *Hadley v. Baxendale*, 156 Eng. Rep. 145, 151 (Ex. 1854). This rule limits generally the recovery of damages in actions for breach of contract. To recover, a disappointed borrower must not only prove his damages with reasonable certainty, he must also show that they resulted naturally — according to the usual course of things — from the breach or that, at the time the contract was made, such damages were in the contemplation of the parties as a probable result of the breach. Additionally, the borrower must demonstrate that, upon the lender's breach, he minimized his damages by securing the money elsewhere if available. When alternative funds are unavailable, however, the borrower may recover the damages actually incurred because of the breach, subject to the general rules of foreseeability and certainty of proof. *See* 5 Corbin, Contracts § 1078 (1964); 11 Williston on Contracts, § 1411 (3d Ed. Jaeger 1968); Annot., 36 A.L.R. 1408 (1925); 22 Am. Jur. 2d *Damages* §§ 68, 69 (1965); *Coles v. Lumber Co.*, 150

---

2. Annot., 41 A.L.R. 357 (1926); Draper, The Broken Commitment: A Modern View of the Mortgage Lender's Remedy, 59 Cornell L.R. 418 (1974). *See Norwood v. Crowder*, 177 N.C. 469, 472, 99 S.E. 345, 346 (1919).

3. *See Columbus Club v. Simons*, 110 Okla. 48, 236 Pac. 12; Annot., 41 A.L.R. 350 (1925); *Vandeventer v. Dale Construction Co.*, 271 Ore. 691, 534 P. 2d 183 (1975); *Cuna Mutual Insurance Society v. Dominguez*, 9 Ariz. App. 172, 175, 450 P. 2d 413, 416 (1969); *Cohen v. Leaman and Cles*, 152 So. 136 (La. App. Ct. Orleans 1934); *Selective Builders, Inc. v. Hudson City Savings Bank*, 137 N. J. Super. 500, 507, 349 A. 2d 564, 569 (1975); 81 C.J.S. *Specific Performance* § 94 (1977); 71 Am. Jur. 2d *Specific Performance* § 104 (1973); 5A Corbin, Contracts § 1152, 167-68 (1964); Groot, Specific Performance of Contracts to Provide Permanent Financing, 60 Cornell L.R. 718, 736-742 (1975).

N.C. 183, 63 S.E. 736 (1909); *Anderson v. Hilton and Dodge Lumber Co.*, 121 Ga. 688, 49 S.E. 725, 727 (1905); *Bond Street Knitters, Inc. v. Peninsula National Bank*, 266 App. Div. 503, 42 N.Y.S. 2d 744 (1943); *Davis v. Small Business Investment Co. of Houston*, 535 S.W. 2d 740, 742-43 (Tex. Civ. App.-Texarcana 1976).

The rule governing damages for breach of a contract to lend money is nowhere stated more succinctly than in Restatement of Contracts § 343 (1932):

"Damages for breach of a contract to lend money are measured by the cost of obtaining the use of money during the agreed period of credit, less interest at the rate provided in the contract, plus compensation for other unavoidable harm that the defendant had reason to foresee when the contract was made.

"*Comment*:

a. This Section is an application of the general rules of damages to a special class of contracts. The damages awarded are affected by the fact that money is nearly always obtainable in the market. If the loan was to be repayable on demand, or if the contract rate of interest is as much as the current market rate and the money is available to the borrower in the market, his recoverable damages are nominal only. He is expected to avoid other harm by borrowing elsewhere if he can, the reasonable expenses being chargeable to the defendant. Sometimes inability to borrow elsewhere or the delay caused by the lender's action results in loss of a specific advantageous bargain, an unfinished building, or an equity of redemption in mortgaged land; damages are recoverable for losses if the lender had reason to foresee them."

Clearly, the plaintiffs in this case have been injured by defendant's breach of contract. Without defendant's commitment to provide long-term financing they would not have begun construction of the motel project. When it was completed and the construction loan from CCB became due they were unable to obtain alternative long-term financing because none was available at any rate of interest. Plaintiffs were able to forestall foreclosure only by refinancing the construction loan with a demand note at a fluctuating rate of interest which varied from 2 to 3% above CCB's

prime rate and was always in excess of the contract rate. At the time of the trial CCB was still carrying the construction loan.[4] Thus, this case differs significantly from those cases involving a disappointed developer-borrower who, unable to obtain specific performance or an alternative permanent loan, either suffers foreclosure[5] or obtains alternative permanent funds at additional expense, for a shorter time, or at a higher but constant rate of interest.[6]

Specifically, the question for our determination is the following:

What is the measure of damages for breach of a contract to make a loan of $1,162,500 at 9½% interest per annum, the loan to be amortized over 300 monthly installments and to be used to take out a short-term construction loan, when a substitute loan was unobtainable upon any terms at the time of the breach and, in order to forestall foreclosure, the borrowers had to refinance the construction loan by a demand note at a fluctuating rate of interest for a period of 18 months?

At trial plaintiffs sought to recover — and the judge purported to assess — their past, present and prospective damages. The case was tried upon the fiction that at the time of trial plaintiffs had obtained a permanent loan at 10½% interest, which the court found was the lowest prevailing rate of interest for a comparable long-term commercial loan as of 1 October 1974, the date of the breach. In attempting to fashion a rule which would appropriately measure plaintiffs' damages the trial judge analogized this case to those in which the borrower actually obtained another loan. On this theory, the trial court awarded plaintiffs general damages in the amount of $120,000, this amount being the difference between the interest on a 25-year loan of $1,162,500 at 10½% per annum and a similar loan at 9½%, reduced to present value and "discounted for the likelihood of early payment." As special damages, Judge McKinnon awarded plaintiffs $5,888.12, the total of amounts which plaintiffs reasonably expended in

---

4. Upon oral argument here, in response to questions from the Court, counsel for plaintiffs stated that CCB was still carrying the construction loan.

5. *St. Paul at Chase Corporation v. Manufacturer's Life Ins. Co.*, 262 Md. 192, 278 A. 2d 12, *cert. denied*, 404 U.S. 857 (1971).

6. *Bridgkort Racquet Club v. University Bank*, 85 Wis. 2d 706, 271 N.W. 2d 165 (1978).

refinancing their construction loan with CCB to prevent foreclosure, and in their unsuccessful attempts over 18 months to secure a replacement long-term loan. The judge, however, refused to allow any recovery of the $184,619.49 in interest which plaintiffs paid CCB on the demand note during that 18-month interim.

The Court of Appeals affirmed the trial judge's award of $5,888.12 in special damages. This ruling was clearly correct, and we affirm it. As the Court of Appeals pointed out, additional title insurance and brokerage, accounting and appraisal fees "were foreseeable expenses which, but for the breach, plaintiffs would not have incurred." With reference to these expenditures, defendant concedes in its brief filed in this Court that "in view of the evidence and the Trial Court's explicit and implicit factual findings pertaining to these items there is no room for further argument and the judgment of the Trial Court is binding as to such damages."

The Court of Appeals also ruled that the trial judge was correct in using the lowest prevailing rate of interest for a long-term commercial loan (10½%) to determine "the basic measure" of plaintiffs' damages, *i.e.*, the difference between the interest on the loan at the contract rate during the agreed period of credit and the rate (not exceeding that permitted by law) which plaintiffs would have had to pay for the money in the market on the date of breach.[7] Defendant argues that the use of a hypothetical loan at the lowest prevailing rate of interest for comparable long-term loans, at least in cases where an alternative lender cannot be found, is too speculative and uncertain a technique for approximating the borrower's prospective losses. However, a party seeking recovery for losses occasioned by another's breach of contract need not prove the amount of his prospective damages with absolute certainty; a reasonable showing will suffice. "Substantial damages may be recovered though plaintiff can only give his loss proximately." *Wilkinson v. Dunbar*, 149 N.C. 20, 22, 23, 62 S.E. 748 (1908). *See Tillis v. Cotton Mills & Cotton Mills v. Tillis*, 251 N.C. 359, 366-67, 111 S.E. 2d 606, 612, 613 (1959); *Thrower v. Dairy Products*, 249 N.C. 109, 113, 105 S.E. 2d 428, 430, 431 (1958); *Perkins v. Langdon*, 237 N.C. 159, 171, 74 S.E. 2d 634, 644 (1953).

---

7. *Hedden v. Schneblin*, 126 Mo. A. 478, 104 S.W. 887, 890 (1907); Annot., 36 A.L.R. 1408, 1410-11 (1925); Restatement, Contracts § 343 (1932); 22 Am. Jur. 2d *Damages* § 68 (1965).

In our view, plaintiffs have reasonably demonstrated that as a consequence of defendant's breach of its loan commitment they will suffer prospective losses; and we agree with the Court of Appeals that the trial court's use of the lowest prevailing rate for comparable long-term loans as a figure to be compared with the contract interest rate represents effort to provide relief from these prospective damages. We also agree that the trial judge erred in reducing the present worth of plaintiff's prospective damages ($143,282.03) to the amount of $120,000 "for the likelihood of early payment."

Although a witness for defendant opined that the average life of a commercial loan such as the one defendant was committed to make for plaintiffs was "approximately seven years," no witness attempted to fix the value of such a probability. Further, there was no evidence that plaintiffs contemplated early payment of the loan. The Court of Appeals, therefore, properly ordered this reduction stricken, and we affirm.

Finally, the Court of Appeals concluded that the trial judge erred in refusing to allow plaintiffs to recover the $184,618.49 in interest which they paid CCB on the demand notes during the 18 months elapsing between the date of defendant's breach of its contract and the date of the trial. This interest, that court said, was recoverable as special damages which defendant should have foreseen as the probable consequence of its failure to provide plaintiffs the promised long-term financing. Thus, the question remaining is whether, in order to avoid foreclosure, a disappointed borrower to whom a defaulting lender had committed long-term financing to pay off a temporary construction loan, is entitled to obtain temporary refinancing at a higher rate of interest and to recover the cost of this refinancing as special damages.

On the ground that such refinancing was an unforeseeable consequence of the breach defendant argues that the trial court properly denied plaintiffs any recovery of the interest they paid on the demand note which refinanced the temporary construction loan. In our view, this contention by a defaulting lender, fully aware of the purpose for which plaintiffs had secured its commitment, is entirely unrealistic. In 11 Williston on Contracts § 1411 (3d Ed. Jaeger 1968) it is stated:

"It will frequently happen that the borrower is unable to get money elsewhere, and, if the defendant had notice of the purpose

for which the money was desired, he will be liable for damages caused by the plaintiff's inability to carry out his purpose, if the performance of the promise would have enabled him to do so."

The case of *St. Paul at Chase Corp. v. Manufacturers Life Ins. Co.*, 262 Md. 192, 278 A. 2d 12, *cert. denied*, 404 U.S. 857 (1971), grew out of the defendant's breach of a commitment to provide the plaintiff with permanent financing "to take out" a construction loan on a high rise apartment building. When the defendant canceled its commitment and the plaintiff was unable to obtain a substitute loan, the bank carrying the construction loan foreclosed the property and obtained a deficiency judgment against the plaintiff, which then sued the defendant for damages. In affirming the trial court's award of compensatory damages which would enable the plaintiff to pay the deficiency judgment and other "consequential damages," the Court of Appeals of Maryland also adopted both the judge's rationale and his succinct statement of it. After noting that in loan transactions such as the one in suit "the parties, of course, anticipate that everything will proceed according to Hoyle — that there will be no breach by either party," Judge Proctor added:

"On the other hand, the would be permanent mortgage lender *must contemplate* that if, at the last minute, it cancels its commitment such action would be disastrous to the borrower; that in such event obtaining a new permanent mortgage loan would be well-nigh impossible, for the reason that whatever brought about the cancellation would in all likelihood prevent another lender from entering the fray; that one doesn't find someone willing and able to lend $4,800,000 at a moment's notice; that, under such circumstances, foreclosure under the construction mortgage would not only be a probability, it would be almost inevitable." (Emphasis added.) 262 Md. at 243, 278 A. 2d at 36.

Whether the loan commitment be for $4,800,000 or $1,162,500, we harbor no doubt that a committed permanent lender on a substantial building project certainly must foresee that a breach of his commitment a relatively short time before the date he has contracted to provide the money to pay off the interim construction loan will result in substantial harm to the borrower.

Defendant, in this case, being unable to find a lender willing to make the permanent loan it had committed itself to provide plaintiffs, formally notified them on 6 August 1974—less than two months before the scheduled closing date—that it would not make the loan. At that time the same conditions which had thwarted defendant's efforts to obtain the loan also thwarted plaintiffs. In a reasonable effort to minimize their losses, while they continued their search for another permanent loan plaintiffs refinanced the construction loan to prevent foreclosure of property in which they had acquired equity of approximately $627,500. That their search during the subsequent 18 months proved futile is no reason to deny them compensation for the resulting damages they sustained during that period.

However, our conclusion that plaintiffs should recover as foreseeable damages their losses arising from the interest payments on the demand notes does not necessarily entail an award for the full amount of interest actually paid to CCB. On the contrary, we hold that the Court of Appeals erred insofar as it awarded plaintiffs both the full amount of interest actually paid CCB from the date of the breach until the date of trial *and* the present value of the difference between the interest on $1,162,500 amortized over 25 years from the date of the trial at the hypothetical rate of $10\frac{1}{2}\%$ per year and the contract rate of $9\frac{1}{2}\%$.

In *Bridgkort Racquet Club v. Univeristy Bank*, 85 Wis. 2d 706, 271 N.W. 2d 165 (1978), plaintiffs contracted with defendant University Bank for a loan of $250,000 at $10\frac{1}{4}\%$ to be amortized over a 15-year period. The loan closing, which was scheduled for 13 January 1976, involved both the short-term construction lender, and long-term financiers. The short-term loan was closed on 13 January, but on 23 January 1976 plaintiffs discovered that the defendant University Bank had breached its contract and would not make its long-term loan. After extensive attempts to obtain financing at a comparable rate, the plaintiffs obtained financing at 11% for the same 15-year period. The Wisconsin court recognized the plaintiff's damages as the difference between the cost of obtaining substitute money at an increased rate of interest and the interest rate specified in the contract. In the case at bar, plaintiffs contracted with defendant to have the use of $1,162,500 from 1 October 1974 until 1 October 1999. To award

plaintiffs the entire amount of interest paid to CCB from the time of the breach until the time of the trial ($184,619.49), with no deduction for interest at the contract rate of 9½%, would give plaintiffs the use of $1,162,500 interest-free for that 18 months period. When defendant failed to make the agreed loan on 1 October 1974 it became liable to plaintiffs *at that time* for the increased cost of obtaining the use of the money "during the agreed period of credit," that is, 25 years from 1 October 1974.

We are of the opinion that the Wisconsin Court in Bridgkort Racquet Club, *supra*, was correct in determining the plaintiffs' damages to be the differential between the cost of obtaining new financing and the interest payments specified in the contract. Based on this principle, plaintiffs' recovery of interest payments made to CCB during this 18-month period must be reduced by the amount of interest which would have been payable to defendant at the contract rate of 9½%.

Having concluded that plaintiffs are entitled to compensatory damages for the cost of refinancing during the 18-month period between the date of defendant's breach and trial, and a general damages award resulting from defendant's breach, we believe the most equitable remedy will be achieved by compensating plaintiffs for the amount of their actual losses up until the date of trial and using the difference between the hypothetical interest rate of 10½% and the contract rate as the basis for determining the damages sustained after the trial. The record shows that for each of the 300 months of the loan plaintiffs contracted for, the amount of interest which plaintiffs would have been obligated to pay defendant can be determined with exactitude. Therefore the amount of plaintiffs' actual damages prior to trial can be computed by subtracting from the $184,619.49 actually paid CCB by March 31, 1976, the amount of interest plaintiffs would have paid to defendant under the contract by that date. As to plaintiffs' prospective losses from the contractural breach, they can be calculated by using the differential between the 10½% per annum rate which the trial court hypothesized to be the lowest prevailing rate of interest on 1 October 1974 for a long-term commercial loan on a project such as plaintiffs' and the contract rate of 9½%. Plaintiffs are therefore entitled to the present value of the difference in interest payments owed under the contract from 1 April 1976, the date of the trial, until 1 October 1999 and the in-

terest which would have been paid during the same period for a loan bearing interest at 10½% per annum.

This cause is returned to the Court of Appeals for remand to the Superior Court of Wake County with instructions that, after hearing such additional evidence as may be necessary to make the calculations required to determine the amounts defined in subsections (b) and (c) below, that court shall enter judgment that plaintiff recover of defendant as damages the sum of the amounts specified in subsections (a), (b), and (c) as follows:

(a) $5,888.12 expended for additional title insurance, brokerage, accounting, and appraisal fees necessitated by defendant's breach;

(b) $184,619.49, less the amount of interest plaintiffs contracted to pay defendant from 1 October 1974 until 31 March 1976;

(c) the present value of the amount determined by subtracting the interest payments which were to have been made by plaintiffs pursuant to the contract from 1 April 1976 until 1 October 1999, from the interest payable during the same period on a loan of $1,162,500, amortized over 300 months from 1 October 1974 bearing an interest rate of 10½% per annum.

The judgment entered shall also provide that the damages therein awarded plaintiff shall bear interest at the legal rate of six percent from 28 May 1976, the date of the judgment from which the parties appealed. *See* G.S. 24-1 and 24-5 (1965); 45 Am. Jur. 2d *Interest and Usury* § 109 (1965). *See also Jackson v. Gastonia,* 247 N.C. 88, 100 S.E. 2d 241 (1957).

For the reasons stated and specified above, the decision of the Court of Appeals is

Affirmed in part, and

Reversed in part.