UNITED ROASTERS, INC., Appellee,

v.

COLGATE–PALMOLIVE COMPANY, Appellant,

State of North Carolina, Amicus Curiae.

UNITED ROASTERS, INC., Appellant,

v.

COLGATE–PALMOLIVE COMPANY, Appellee,

State of North Carolina, Amicus Curiae.

Nos. 80–1139, 80–1184.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 2, 1980.

Decided May 18, 1981.

Rehearing and Rehearing En Banc Denied June 19, 1981.

---

George W. House, L. P. McLendon, Jr., Greensboro, N. C. (Reid Phillips, Brooks, Pierce, McLendon, Humphrey & Leonard, Greensboro, N. C., on brief), for United Roasters, Inc.

William H. McCullough, H. Hugh Stevens, Jr., Raleigh, N. C. (J. Allen Adams, Charles C. Meeker, Sanford, Adams, McCullough & Beard, Raleigh, N. C., on brief), for Colgate-Palmolive Co.

Rufus L. Edmisten, Atty. Gen., Alan S. Hirsch, Asst. Atty. Gen., Raleigh, N. C., on brief, for amicus curiae.

Before HAYNSWORTH, and FIELD, Senior Circuit Judges, and HALL, Circuit Judge.

HAYNSWORTH, Senior Circuit Judge:

United Roasters, Inc., a North Carolina corporation, and the Colgate Palmolive Co., a Delaware corporation, filed cross appeals from the judgment in this diversity action for breach of contract. The jury found that Colgate had broken three different contractual obligations, including an implied obligation to exercise in good faith an unqualified right to terminate the contract, and awarded United Roasters damages totaling $789,000. The district court held, however, that the breach of the implied good faith covenant was not an unfair or deceptive act or practice in the conduct of commerce within the meaning of N.C.G.S. § 75–1.1, and declined to award treble damages under § 75–16. *United Roasters, Inc. v. Colgate-Palmolive Co.,* 485 F.Supp. 1049 (E.D. N.C.1980).[1] Although we believe that United Roasters misconceived the theory of a common-law branch of this case, we find that the district court reached the correct result, and affirm its judgment.

I.

In a contract executed in 1973, Colgate obtained the right to manufacture and distribute Bambeanos, a roasted soybean snack developed by United Roasters. The contract provided for an initial test-marketing period of two years, followed by twenty-five years of full performance. Different terms as to royalties, right to terminate, and reconveyance of assets prevailed during these two periods, with terms more favorable to United Roasters effective during the latter twenty-five years. In February 1976, however, United Roasters agreed to an indefinite extension of the test-marketing period, in exchange for Colgate's agreement to repay United Roasters' promissory note, in the amount of $88,000, to the Cameron-Brown Capital Corporation. During the test-marketing period, Colgate was entitled to terminate performance in its sole discretion on thirty days written notice to United Roasters.

From late 1973 through the spring of 1976, Colgate tested Bambeanos in Syracuse, New York, and the Boston area. Although Colgate did not realize a profit, the product garnered a substantially larger dollar share of these markets than anticipated. Bambeanos seemed slated for permanent marketing until December 1975, when Colgate publicly announced its plans to merge with Riviana Foods, Inc., a large food processing company. In the ensuing months, Colgate officers and employees exchanged a series of internal memoranda discussing the possible termination of the United Roasters contract, in light of the imminent availability of Riviana's facilities. Although there is no direct evidence that Colgate decided to terminate at that time, Colgate ceased production of Bambeanos in January, substantially stopped advertising in February, transferred its product manager to another project in March and had sold its entire inventory of raw soybeans and Bambeanos by May.

1. An earlier decision on a motion for partial summary judgment on the treble damage issue is reported at 485 F.Supp. 1041 (E.D.N.C.1979).

The Riviana merger was approved by the Federal Trade Commission and the companies' boards of directors and shareholders by June 1976. On July 19, Colgate orally advised United Roasters that it was terminating the contract. The termination was confirmed in writing on August 27. United Roasters requested reconveyance of its assets, together with any improvements, pursuant to the terms of the contract, but Colgate refused to reconvey unless certain additional conditions were met. Ultimately, Colgate neither returned United Roasters' assets, including its production facilities, nor paid the obligation to Cameron-Brown.

Unable to resolve their dispute through negotiation, United Roasters resorted to this diversity action. It sought recovery on a number of theories, several of which are irrelevant here. United Roasters did allege, however, that Colgate decided to terminate in early 1976 and failed to give timely notice, contrary to both the express provisions of the contract and an implied obligation to exercise the right to terminate in good faith. United Roasters sought both contractual damages and treble damages, arguing that this conduct was an unfair or deceptive commercial practice as defined in N.C.G.S. § 75–1.1. In addition, United Roasters charged that Colgate was liable for its failure to reconvey the assets and to pay the Cameron-Brown note.

After an extensive trial, the district judge submitted questions to the jury for a special verdict. The jury found that Colgate wrongfully refused to reconvey United Roasters' assets, for which it was liable in the stipulated amount of $130,000. Moreover, the jury concluded that Colgate had agreed to pay the Cameron-Brown note without an expectation of repayment out of royalties or otherwise. Damages for this breach were stipulated at $88,000. Finally, the jury found that Colgate acted in bad faith in exercising its right to terminate the contract. The jury concluded that Colgate had decided to terminate in the first quarter of 1976 and that its failure to give reasonably prompt notice, although not deceptive, was unfair. The jury awarded

United Roasters $571,000 after subtracting damages which reasonably could have been avoided.

The district judge entered partial judgment on the jury's verdict. The court declined, however, to award treble damages, reasoning that Colgate's breach of its implied obligation of good faith was neither an act or practice in the conduct of commerce, nor unfair or deceptive, within the meaning of § 75–1.1.

## II.

On appeal the parties principally contend about the existence in North Carolina of a good faith limitation upon the exercise of an unconditional right of contract termination. Colgate maintains that there is no such limitation, while United Roasters insists that there is, and that a violation of the good faith limitation is an unfair commercial practice within the meaning of § 75–1.1 so as to require a trebling of the damages. Since the question of the existence of any such limitation is unillumined by the North Carolina decisions and since its application in this context would be highly questionable anywhere, we think the thrust of the plaintiff's claim was largely misconceived.

There is nothing wrong with the general principle. Dean Roscoe Pound observed, "[i]n civilized society men must be able to assume that those with whom they deal in the general intercourse of society will act in good faith." 3 R. Pound, Jurisprudence 10 (1959). During the last fifty years, a requirement of good faith dealing has emerged as a general principle of contract law. It is recognized in a majority of jurisdictions and in leading model codes. *See* Burton, *Breach of Contract and the Common Law Duty to Perform in Good Faith*, 94 Harv.L.Rev. 369 (1980); Holmes, *Is There Life After Gilmore's Death of Contract?—Inductions from a Study of Commercial Good Faith in First-Party Insurance Contracts*, 65 Cornell L.Rev. 330 (1980); Summers, *"Good Faith" in General Contract Law and the Sales Provisions of the*

*Uniform Commercial Code,* 54 Va.L.Rev. 195 (1968). It has been recognized by the North Carolina Court of Appeals, *Weyerhaeuser Co. v. Godwin Building Supply Co.,* 40 N.C.App. 743, 253 S.E.2d 625 (1979), and by this court, *de Treville v. Outboard Marine Corp.,* 439 F.2d 1099 (4th Cir. 1971).

In *de Treville,* we applied the principle to the termination of a franchise agreement. The franchisee for the sale and servicing of Evinrude Motors allegedly had built up a substantial business and a large inventory of parts and machines for servicing them. When the manufacturer, without offering to purchase the inventory and equipment, terminated the franchise and awarded it to a competitor, we held, under settled South Carolina law, that the manufacturer's action was subject to the limitation of the good faith principle. There is, however, a substantial difference of opinion as to the application of the principle to unconditional rights of contract termination. *Compare, e. g., Busam Motor Sales v. Ford Motor Co.,* 203 F.2d 469 (6th Cir. 1953); *Fortune v. National Cash Register Co.,* 373 Mass. 96, 364 N.E.2d 1251 (1977); *J. R. Watkins Co. v. Rich,* 254 Mich. 82, 235 N.W. 845 (1931); *and Monge v. Beebe Rubber Co.,* 114 N.H. 130, 316 A.2d 549 (1974) *with Bushwick-Decatur Motors, Inc. v. Ford Motor Co.,* 116 F.2d 675 (2d Cir. 1940); *A & M Fix-it, Inc. v. Schwinn Bicycle Co.,* 494 F.Supp. 175 (D.Utah 1980); *and Niagara Mohawk Power Corp. v. Graver Tank & Mfg. Co.,* 470 F.Supp. 1308 (N.D.N.Y.1979). Perhaps the application should vary with the context. When termination is oppressive, when it would frustrate expectations reasonably held, though unsecured by express contractual agreements and when it will impose substantial losses upon the other party, application of the principle may well be called for; in other contexts, an exercise of an unqualified right of termination should best be left to a determination of his own best interest by the party possessing the right.

We find no guidance in North Carolina cases. In *General Tire & Rubber Co. v. Distributors, Inc.,* 253 N.C. 459, 117 S.E.2d 479 (1960) and *City of Gastonia v. Duke Power Co.,* 19 N.C.App. 315, 199 S.E.2d 27 (1973), the North Carolina courts applied the traditional rule that an absolute right to terminate may be freely exercised, but apparently a good faith limitation theory was not urged in either case. In *Dockery v. Lampart Table Co.,* 36 N.C.App. 293, 244 S.E.2d 272 (1978), the North Carolina Court of Appeals declined to recognize a tort of "retaliatory discharge" and adhered to the traditional rule that a contract of employment at will is terminable by either party without regard to just cause. We need not speculate, however, about whether North Carolina might recognize the principle in contract termination cases or how those courts might apply it if the principle is recognized in some circumstances. The facts here do not call for a resolution of the question.

The case was submitted to the jury on the theory that bad faith inhered in a decision by Colgate early in the year to terminate the contract without promptly communicating its decision to United Roasters.[2] In answer to special interrogatories, the jury found that Colgate had decided during the first quarter of the year to terminate the contract, and it is undisputed that United Roasters was uninformed of that decision until mid-July. The ultimate finding was bad faith on Colgate's part in not communicating its decision promptly to United Roasters.

Whatever may be said in favor of an application of the limiting principle to an exercise of an unconditional right of termination, there is very little to be said in favor of a rule of law that good faith requires one possessing a right of termination to inform the other party promptly of any decision to exercise the right. A tenant under a month-to-month lease may decide in January to vacate the premises at the

2. Colgate contended it did not finally decide to terminate the contract until after final approval of its acquisition of Riviana Foods in June.

end of September. It is hardly to be suggested that good faith requires the tenant to inform the landlord of his decision soon after January. Though the landlord may have found earlier notice convenient, formal exercise of the right of termination in August will do. The tenant, however, may not stop paying rent when he comes to an early decision to terminate the lease later; he is obliged to pay the rent through September.

■ What is wrong with Colgate's conduct in this case is not its failure to communicate a decision to terminate arrived at before the end of March, but its cessation of performance. Clearly it had an obligation of good faith performance up until its right of termination was actually effective. The contract expressly obliged it to use its best efforts in the promotion of Bambeanos. Instead of doing that, it simply ceased its performance. It stopped manufacturing Bambeanos. It ended its advertising campaign in Boston and in Syracuse and sold its inventory. Quite simply, it broke its contract when it terminated its performance, which was United Roasters' contractual due.

North Carolina law does require that parties perform their contractual obligations in good faith. *See Weyerhaeuser, supra; Mezzanotte v. Freeland*, 20 N.C.App. 11, 200 S.E.2d 410 (1973). Colgate did not do that, and is responsible to United Roasters in resulting damages.

In *de Treville*, the substantial economic losses visited upon the franchisee by the manufacturer's termination of the franchise would have been uncompensable except for the application of the good faith principle to the manufacturer's exercise of its contractual right. It is perhaps a principle of last resort to adjust economic harm wrongly or unconscionably inflicted. In an ordinary breach of contract claim such as this, in which the economic losses are compensable under traditional contract principles, the reason for the emerging principle is simply not present, for United Roasters' economic losses are compensable under the traditional principles. *See* Holmes, *Is There Life After Gilmore's Death of Contract?—Inductions from a Study of Commercial Good Faith in First-Party Insurance Contracts*, 65 Cornell L.Rev. 330 (1980).

### III.

Though this branch of the case was not submitted to the jury on a simple contract breach theory, we may affirm on that basis.

### A.

In Count 1 of its complaint, United Roasters had alleged its theory of bad faith in the exercise of Colgate's right of termination, but in Count 3 it alleged nonperformance of Colgate's express contract obligations. At the conclusion of the presentation of plaintiff's case, however, it was required by the court to make an election between the two theories. It elected to proceed upon the theory upon which Count 1 was based. Having made that election, it made no objection to the jury instructions on the ground that they omitted to submit the case on the theory of Count 3.

The plaintiff was wrongly forced to make the election it did. Rule 8(e)(2) of the Federal Rules of Civil Procedure permits the pleading of alternative or inconsistent claims, while Rule 15(b) authorizes the amendment of the pleadings to conform to the evidence produced at trial. Rule 54(c) requires the court to grant relief to which a prevailing party is entitled, though unrequested in a pleading. "Ordinarily, a plaintiff may pursue alternative remedies, however 'inconsistent,' with final 'election' postponed to a late stage of the action—after the proof is in or even after the fact-finder, court or jury, has made its findings on both alternatives." Restatement (Second) of Judgments § 61.1, Comment m, at 174–75 (Tent. Draft No. 5, 1978).

■ Of course, the legal theories exemplified by Counts 1 and 3 of the complaint were not in the least inconsistent. They were simply alternative theories based upon the same set of operative facts. To the extent that each theory had legal validity as applied to the operative facts, the plain-

tiff was entitled to have both theories submitted to the jury, and should not have been required to make the election it did. *Breeding v. Massey*, 378 F.2d 171 (8th Cir. 1967). Having been erroneously forced to make that election, however, it surely was not incumbent upon United Roasters to reassert its objection to the jury instructions on the ground that they did not submit the theory of Count 3. Rule 51 does not require us to ignore the deficiency of the jury instructions for failure to include a legal theory the plaintiff had erroneously been forced to abandon.

### B.

The direct evidence of nonperformance by Colgate is the circumstantial evidence upon which United Roasters attempted to found its bad faith termination claim. Though the theory, we think, was misconceived, Colgate had every opportunity to offer all countervailing evidence it possessed and every incentive to do so. Moreover, it is clear that the jury found the operative facts leading to the legal conclusion of nonperformance by Colgate. We may affirm a judgment of a district court upon a ground neither relied upon by the district court nor urged upon it at trial, and we need not remand this case for redetermination of the factual issues already resolved by the jury's verdict.

### IV.

■ We think the district court properly denied treble damages on this phase of the case.

Section 75–1.1 makes unlawful unfair methods of competition and unfair or deceptive acts or practices in or affecting commerce. Under § 75–16 a person injured by such acts is entitled to treble damages.

There is indication in *State ex rel. Edmisten v. J. C. Penney Co.*, 292 N.C. 311, 233 S.E.2d 895 (1977), that the North Carolina Supreme Court thought that the "commerce" contemplated by 75–1.1 was the sale of goods, and the trial judge denied treble damages in reliance on that case since he concluded that the contract here did not involve the sale of goods. Later, however, the North Carolina Supreme Court broadened its interpretation of the meaning of "commerce" in that section. In *Johnson v. Phoenix Mutual Life Insurance Company*, 300 N.C. 247, 266 S.E.2d 610 (1980), it held that a contract between a mortgage broker and a borrower for the exclusive right to place permanent mortgage financing was in commerce within the meaning of the statute, though it upheld summary judgment for the mortgage broker on the ground that there was no warrant for a finding that any unfair or deceptive act or practice had been committed. Quite recently, however, the Supreme Court of North Carolina in *Marshall v. Miller*, 302 N.C. 539, 276 S.E.2d 397 (1981), put a different gloss upon the statute. It was repeatedly described as an act for the protection of consumers, and the treble damages provision of § 75–16, it said, was intended to create an effective private remedy for aggrieved consumers. In that context, the provision of treble damages is surely understandable.

In *Marshall*, however, the earlier decision in *Johnson* was not overruled or repudiated. If the North Carolina statute was intended only for the protection of consumers purchasing goods and services, it is difficult to understand its application to a developer of a shopping center seeking more than two million dollars in mortgage financing. Arguably, under *Johnson* sophisticated business concerns like United Roasters may be within the Act's protection, and the contract between it and Colgate may be commerce within the meaning of the statute.

The district court was also of the opinion that the statute was inapplicable here because it found that Colgate had not been intentionally unfair or deceptive. That conclusion, however, is substantially undercut by the recent decision in *Marshall*. There, it was held that purchasers of mobile homes and leases of space upon which to maintain them were the victims of misrepresentations about facilities and services to be provided by the park's owner. The court held that it was no defense that the owner's representations had been made in good

faith. Under the statute, one is only to look at the impact upon the victim or victims. The owner had not complied with the representations, and, however innocent his intentions at the time he made them, the victims of those misrepresentations were entitled to trebled damages.

The context of this case is far from that in which people acquire mobile homes and the rights to place them upon lots in mobile home parks, but, if the statute is applicable here, *Marshall* strongly suggests that the fact that Colgate may not have intended to be unfair or deceptive is no defense.

Remaining to be determined, however, is whether Colgate's acts were unfair or deceptive within the meaning of § 75–1.1. It is clear that the statute encompasses such things as misrepresentation and a wide variety of shady practices sometimes associated with the marketing of consumer goods and services. Whatever the limit of their reach, however, the words must mean something more than an ordinary contract breach.

In a sense, unfairness inheres in every breach of contract when one of the contracting parties is denied the advantage for which he contracted, but this is why remedial damages are awarded on contract claims. If such an award is to be trebled, the North Carolina legislature must have intended that substantial aggravating circumstances be present. The statute outlaws unfair competition, and the unfair acts and practices made unlawful include acts or practices not aptly described as deceptive. The North Carolina Supreme Court in *J. C. Penney*, in dicta, listed a number of acts or practices thought to be representative of those things proscribed by the statute. They are actually deceptive or approach deception. In each instance, the deception or unfairness was present at the time of contract formation. Those acts and practices were quoted by Judge McMillan in *CF Industries, Inc. v. Continental Gas Pipe Line Corp.*, 448 F.Supp. 475 (W.D.N.C.1978), when he adopted a limited construction of the North Carolina statute. He concluded that an intentional breach of a valid contract was not a violation of the statute.

Under the jury's resolution of the facts, Colgate's violation of its contractual obligation was an intentional breach, but there was neither unfairness nor deception in formulation of the contract, and the jury found no deception in the circumstances of its breach. The contract here was carefully negotiated and drawn by sophisticated parties. There is no hint of any unfairness to either party before Colgate's cessation of performance. It then broke the contract, but we cannot conclude that unfairness inhered in the circumstances of the breach within the meaning of the statute simply because the breach was intentional and not promptly disclosed.

V.

Colgate has several other contentions, only two of which merit our notice.

The jury's award of $571,000 on this phase of the case was based upon the testimony of an expert witness who undertook to value the Bambeanos business as a going concern before Colgate's abandonment of it. It is doubtful that United Roasters had the financial resources to take over that business and pursue it, but surely it was entitled to the opportunity to attempt to arrange the necessary financing and to earn the future profits that might reasonably have been expected. At the time, the business had earned no profits, but Bambeanos had captured a larger share of the market in Boston and in Syracuse than initially had been expected, and the jury might reasonably have found, as it did, that further promotion and development would produce future profits. The initial losses from start-up costs in attempting to penetrate those two markets were largely over, and market projections predicted future profits. The plaintiff's expert offered a reasoned estimate of future profits and, by the application of a discount earnings method, arrived at an amount which, in his opinion, a willing buyer would be prepared to pay for the business.

In none of this do we find any error or unfairness to Colgate. By letting the

business run out, Colgate had deprived the plaintiff of an opportunity to sell the business as a going concern or to develop it on its own. Because of Colgate's acts, the calculation of the damages was necessarily dependent upon calculations and estimates of experts in the field. There was adequate support in the record for those calculations and estimates, and the jury was sufficiently informed of the bases of the expert's opinion to assess the weight of the evidence. *See* Federal Rule of Evidence 705; *Story Parchment Co. v. Paterson Paper Co.*, 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931); *Pipkin v. Thomas & Hill, Inc.*, 298 N.C. 278, 258 S.E.2d 778 (1979).

■ Finally, Colgate argues that the $130,000 award for failure to return the physical equipment was duplicated in the award of termination damages. That there was any such duplication is simply speculative, however. No question was put to the jury about any possible duplication before its discharge, and we find no basis for rejection of any part of its verdict.

*AFFIRMED.*