IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-571

Filed 20 May 2026

Wake County, No. 22CV000278-910

NATHANIEL SCOTT WOOLLENS and JAMIE LYNN WOOLLENS, Plaintiffs,

v.

MAZEN EZELDIN HAMAD, individually as Trustee of the Hamad Living Trust Dated November 18, 2016, Defendant.

Appeal by Plaintiffs and cross-appeal by Defendant from judgment entered 8 October 2024 by Judge Jeffery B. Foster in Wake County Superior Court. Heard in the Court of Appeals 14 January 2026.

> *BA FOLK, PLLC, by Tamara Short Weightman and J. Denton Adams, for the plaintiffs-appellants / cross-appellees.*

> *Meynardie & Nanney, PLLC, by Joseph H. Nanney, Jr., for the defendant-appellee / cross-appellant.*

WOOD, Judge.

Plaintiffs Jamie Woollens and Nathaniel Woollens (collectively, "Buyers") appeal and Defendant Mazen Hamad ("Seller") cross-appeals from judgment entered 8 October 2024 following a bench trial determining the issue of damages resulting from a breach of contract. The trial court had previously entered an order regarding liability, concluding Seller breached the contract between the parties and further ordering specific performance.

## I. Factual and Procedural Background

On 2 November 2021, Buyers entered into a contract (the "Contract") with Seller to purchase Seller's home located on Troone Court in Raleigh ("Troone House"). The Contract, in relevant part, states the purchase price to be $645,000.00, closing would take place on 17 December 2021, and Buyers would purchase the home with an 80% loan-to-value ("LTV") mortgage loan. On 9 November 2021, Seller suffered injuries after falling through the ceiling of Troone House while in the attic packing his belongings in anticipation of the sale. Buyers were unaware of Seller's accident and injuries at this time. It was not until approximately a month later, about a week prior to the agreed upon closing date, that Buyers became aware of a potential delay in closing when their realtor informed them the closing attorney was having difficulty communicating with Seller and obtaining the necessary information from him required for closing.

In response to the news of a potential delay in closing, Buyers contacted an attorney to discuss options to ensure closing would take place either on the closing date or as soon as possible thereafter. On 15 December 2021, still unaware Seller had suffered injuries, Buyers' realtor sent Seller's realtor an email asking for a definitive answer as to whether closing would take place as scheduled. The email stated that Buyers would seek legal action to compel closing if Seller would not close as scheduled. On 16 December 2021, Seller sent an email to Buyers via their realtors stating, "there is no way I can proceed with closing tomorrow." Seller explained in

the email that he suffered injuries causing him to be hospitalized and is recovering

from surgery.  The email  stated,

> there is no way I can proceed with closing tomorrow.  There are more than one reason preventing me from doing so, recent hospitalization for an acute trauma which lasted 3 weeks.  I came home 2 weeks ago & currently getting home health.  I'm non weight bearing status for another 5-7 weeks.  In addition to my hip & pelvic fracture surgery, I was found to have torn meniscus in my left knee which may need surgical intervention soon.  I'm staying in my new home but I may have to move back to my old home because it is more suitable for my situation (I can access the second floor via stair lift) which is undoable at the new home.
>
> I'm totally overwhelmed & traumatized physically & emotionally to proceed with the house sale & complex moving of furniture & items I accumulated on over than 30 years.[1]

This email was the extent of what Buyers knew about Seller's accident.

Shortly after receiving the news that Seller was unwilling to close on schedule,

Buyers forwarded Seller's email to legal counsel and stated, "[i]t's go time."[2]  Closing

did not occur on 17 December 2021 as scheduled. On 20 December 2021, Buyers via

legal counsel sent a demand letter to Seller in hopes it would persuade him to close

within the seven-day grace period the Contract provided without requiring legal

action.  On 24 December 2021, Seller purportedly offered Buyers $15,000.00 to be let

---

[1] While Seller mentions he may have to move back into Troone House, testimony reveals that he never did.

[2] Evidence presented at trial tends to show that it was not *impossible* for Seller to close on schedule despite his injuries.

out of the Contract; Buyers did not accept the offer. Buyers' testified they did not accept this offer because they "knew that he wasn't living at that property." Further, when Buyers were asked on cross-examination whether they or anyone on their behalf asked Seller when he could close, Jamie Woollens responded, "No, sir, because moving companies will pack and move your stuff for you. This feels irrelevant to me as to why he couldn't move. And oh, by the way, I also knew that he wasn't living in the home at the time."

On 6 January 2022, Buyers filed their initial complaint in Wake County District Court alleging Seller breached the Contract by failing to close on the agreed upon closing date, 17 December 2021, and that they remain ready, willing, and able to perform their obligations under the Contract. Buyers requested the trial court order specific performance and further alleged they had suffered monetary expenses because of Seller's breach. Seller was eventually served on 1 March 2022 by a private investigator while in his vehicle at a stop sign after other attempts to serve him failed. On 11 March 2022, Buyers filed an amended complaint to attach the Contract as an exhibit; the remainder of the complaint did not change.

On 30 March 2022, Seller purportedly made Buyers a second offer to cancel the Contract, this time offering $50,000.00; Buyers did not accept the offer. In April 2022, Attorney P.J. Puryear ("Puryear"), a friend of Seller, began communicating with Buyers' legal counsel about proceeding with closing and compensation for the delay. Specifically, on 13 April 2022, Puryear sent an email to Buyers' legal counsel stating:

"Good morning Randy—[Seller] is ready to proceed with this transaction. You have indicated there are costs associated with the delay. We need to know what those are so that [Seller] can consider whether he will agree to pay them as part of the closing. Please advise." Buyers' legal counsel responded on 25 April 2022:

> Good morning,
>
> In December when my clients were ready to close, they had a mortgage with a fixed interest rate at 2.9%. If they closed today, their interest rate would be 5.5%. Over the course of the mortgage term, this will result in additional mortgage payments of $306,624.06 as shown in the attached amortization tables.
>
> Since this increase is due solely to your client's refusal to close on the agreed date, we think it is only fair and reasonable that your client compensate my client for the cost of the delay. Therefore, we would be willing to close with a seller credit of $300,000.00 (for round numbers).
>
> Please let me know if this works for your side. We can be ready to close within 2 weeks.
>
> Thanks.

Puryear responded by asking about a rate lock that was alleged in the complaint, to which Buyers' legal counsel replied that the rate lock "has long since expired."

Seller filed his answer on 2 May 2022 in which he asserted that Buyers refused to close the transaction without additional compensation which he did not agree to pay, that Buyers failed to mitigate any alleged damages by not closing, and that he was not responsible for costs Buyers voluntarily incurred as a result of the delayed closing. On 17 June 2022, the action was transferred to Wake County Superior Court

with consent from Buyers and Seller. Buyers filed a motion for summary judgment for which the trial court heard arguments as to liability and specific performance on 24 August 2022. The trial court entered its order for partial summary judgment on 30 August 2022, which ordered:

> 1) That summary judgment be entered against [Seller] as to liability;
>
> 2) That [Seller] shall specifically perform the contract by delivering to [Buyers] or their designated agent a properly executed deed for the Property and other associated documents necessary to affect the transfer of the Property to [Buyers];
>
> 3) That [Seller] shall have seven (7) days from the date of this hearing, through and including August 31, 2022, to tender such closing documents, and [Buyers] shall tender the remaining purchase price to [Seller] at that time;
>
> 4) That the issue of damages to which [Buyers] may be entitled is expressly reserved for future proceedings and decision of this court; and
>
> 5) That the charging of attorney fees and costs is expressly reserved for future proceedings and decision of this court.

Buyers and Seller completed the sale of Troone House on 1 September 2022.[3]

A bench trial on the issue of damages took place on 29 and 30 July 2024. At trial, Buyers presented evidence of monetary damages they had incurred up to the date of the trial as well as future damages they would incur as a result of the delayed

---

[3] Although the 8 October 2024 judgment states Buyers ultimately purchased Troone House from Seller "on or about September 1, *2024*," our review of the record reveals the transfer of property was completed on 1 September *2022*, just days following the 30 August 2022 order for partial summary judgment and specific performance.

closing date. Specifically, Buyers presented evidence tending to show that had the closing occurred on schedule in December 2021 their mortgage loan interest rate would have been 2.99%, but because of the delay in closing their interest rate is ultimately 5.50%. With the increased interest rate, Buyers' monthly mortgage payment is $851.74 more than it would have been had the closing occurred on schedule.

On 8 October 2024, the trial court entered its judgment concluding Buyers suffered the following damages due to Seller's breach totaling $53,373.89:

> a. Direct damages in the amount of $14,655.75 comprising rate lock fees, additional moving expenses, and the cost of an additional inspection;
>
> b. Incidental damages in the amount of $2,695.77 from additional storage fees;
>
> c. Consequential damages of $27,806.17 from additional interest already paid due to [Seller's] breach as of the date of the trial.
>
> d. Consequential damages of $8,216.20 due to reduced equity in [Troone House], despite having paid a higher monthly payment each month.

Additionally, the trial court concluded mortgage payments for the Temple Street house[4] during the delay in closing were not recoverable, damages for property damage to Troone House during the delay in closing were not permitted, and damages for

---

[4] During the delay in closing, Buyers lived in a house they owned on Temple Street.

future interest were too speculative. Buyers filed notice of appeal on 6 November 2024. The next day, Seller also filed notice of appeal.

## II. Analysis

On appeal, Buyers argue the trial court erred by concluding that future mortgage loan interest rate damages are too speculative and by failing to award these damages and damages to compensate for the physical damage done to Troone House during the delay in closing, thereby failing to effectuate the remedy of specific performance. Seller on cross-appeal argues the trial court erred by awarding Buyers damages resulting from the increased interest rate and reduced equity up to the date of trial because Buyers failed to mitigate damages and because the award of damages for reduced equity allowed Buyers to "double dip." Additionally, Seller argues the trial court erred by awarding Buyers special damages that were never pleaded.

### A. Standard of Review

> In a bench trial in which the superior court sits without a jury, the standard of review is whether there was competent evidence to support the trial court's findings of fact and whether its conclusions of law are proper in light of such facts. Findings of fact by the trial court in a non-jury trial are conclusive on appeal if there is evidence to support those findings. A trial court's conclusions of law, however, are reviewable *de novo*.

*Hanson v. Legasus of N.C., LLC*, 205 N.C. App. 296, 299, 695 S.E.2d 499, 501-02 (2010) (quoting *Hinnant v. Philips*, 184 N.C. App. 241, 245, 645 S.E.2d 867, 870 (2007)).

When a contract has been breached,

> The injured party is entitled to full compensation for his loss, and to be placed as near as may be in the condition which he would have occupied had the contract not been breached. Generally speaking, the amount that would have been received if the contract had been kept and which will completely indemnify the injured party is the true measure of damages for its breach.

*Botts v. Tibbens*, 232 N.C. App. 537, 542, 754 S.E.2d 708, 712 (2014) (quoting *Troitino v. Goodman*, 225 N.C. 406, 412, 35 S.E.2d 277, 281 (1945)). "The trial court's authority to award damages in a breach of contract action is well established." *Majewski Enters., Inc. v. Park at Langston, Inc.*, 211 N.C. App. 525, 532, 711 S.E.2d 454, 460 (2011) (quoting *S. Bldg. Maint., Inc. v. Osborne*, 127 N.C. App. 327, 331, 489 S.E.2d 892, 895 (1997)).

> Damages are allowed for breach of contract as may reasonably be supposed to have been in the contemplation of the parties when the contract was made or which will compensate the injured party for the loss which fulfillment of the contract could have prevented or the breach of it has entailed.
>
> The party seeking damages must show that the amount of damages is based upon a standard that will allow the finder of fact to calculate the amount of damages with reasonable certainty.

*Botts*, 232 N.C. App. at 542, 754 S.E.2d at 712 (quoting *J.T. Russell & Sons, Inc. v. Silver Birch Pond, LLC*, 217 N.C. App. 290, 297, 721 S.E.2d 699, 704 (2011)).

> The party claiming these damages bears the burden of proving its losses with reasonable certainty. While the reasonable certainty standard requires something more

than "hypothetical or speculative forecasts," it does not require absolute certainty.

And, "while the amount of damages is ordinarily a question of fact, the proper standard with which to measure those damages is a question of law. Such questions are, therefore, fully reviewable by this Court."

*Majewski Enters.*, 211 N.C. App. at 532-33, 711 S.E.2d at 460 (quoting *Matthews v. Davis*, 191 N.C. App. 545, 551, 664 S.E.2d 16, 20-21 (2008)). "Whether special damages arising from the breach of contract may be regarded as within the contemplation of the parties, and therefore recoverable, would depend upon the information communicated or the knowledge of the parties at the time and the reasonable foreseeability of such damages." *Troitino*, 225 N.C. at 412, 35 S.E.2d at 281-82 (cleaned up).

## B. Seller's Arguments

Seller argues the trial court erred by awarding Buyers consequential damages in the amounts of "$27,806.17 from additional interest already paid due to [Seller's] breach as of the date of trial" and "$8,216.20 due to reduced equity in [Troone House], despite having paid a higher monthly payment each month." Specifically, Seller argues these damages were awarded in error because Buyers failed to mitigate their damages, the reduced equity damages were "double dip[ping],[5] and these are special

---

[5] While Seller argues the reduced equity damages were also awarded in error, the only arguments presented include that Buyers "are not able to recover for any 'lost equity' for all the same reasons they are not entitled to recover additional interest charges," there was no appraisal value information presented at trial, calculation of these damages would be "pure conjecture," and the

damages that were never pleaded.

### 1. *Pleading Special Damages*

Seller argues the trial court erred by awarding damages for additional interest paid and reduced equity because special damages were never pleaded. Specifically, Seller contends the facts of this case demonstrate why pleading special damages matters because had Buyers "informed [Seller] that they were going to allow the rate lock to expire, either in an amended pleading or otherwise, or that they would incur what they claimed to be hundreds of thousands of dollars of damages, he could have responded."

In contrast, Buyers assert that Rule 9(g) does not bar recovery for the damages awarded from the increased interest rate and reduced equity because these are loan related damages which naturally flow from the delayed closing and should be recoverable without particularized pleading. Buyers, however, also assert they did specifically plead interest rate damages by pleading about their interest rate lock extension fees; they contend this is a sufficient pleading to alert Seller that their interest rate was affected by the breach and that these interest rate damages were at issue. Lastly, Buyers assert that regardless of whether it is determined the special damages were pleaded, Rule 15(b) applies and Seller had more than two years of

---

"dollars awarded for additional interest were awarded a second time for loss of equity" as this is a single injury. As Seller presents no analysis and cites no case law to support these arguments, we decline to address the equity damages further than we already have throughout this opinion.

notice that Buyers sought to recover damages from the increased interest rate. We agree.

Rule 9(g) requires that "[w]hen items of special damage are claimed each shall be averred." N.C. Gen. Stat. § 1A-1, Rule 9(g). "Facts giving rise to special damages must be alleged so as to fairly inform defendant of the scope of plaintiff's demand. An often repeated statement of this rule has been that special damages must be pleaded with sufficient particularity to put defendant on notice." *Stanford v. Owens*, 46 N.C. App. 388, 398, 265 S.E.2d 617, 624 (1980). However, Rule 15(b) states:

> When issues not raised by the pleadings *are tried by the express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.* Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, either before or after judgment, but failure so to amend does not affect the result of the trial of these issues.
>
> If evidence is objected to at the trial on the ground that it is not within the issues raised by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be served thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

N.C. Gen. Stat. § 1A-1, Rule 15(b) (emphasis added). Buyers' complaint explicitly alleges they are seeking damages for storage fees, rate lock extension fees, additional moving fees, attorney's fees and that:

24. [Buyers] have incurred additional costs as identified in paragraph 14, above, due to [Seller's] breach. Some of those costs are recurring and will continue to accrue until [Seller's] breach is cured.

25. [Buyers'] losses and additional costs are consequential and incidental damages to which they are entitled to recover.

At trial, Seller made a standing objection that "the interest rate is one of the issues that was never pled." The trial court noted the objection and stated it would "decide it at the appropriate time." Buyers later made a motion to amend the pleadings at trial pursuant to Rules 15(a) and 15(b). The trial court stated it would "take it under advisement" but does not appear to have explicitly granted Buyers' motion on the record; however, the trial court appears to have granted the motion after deliberation because it proceeds to award "special damages" "with regard to the cost of the delay and the interest . . . and the reduced equity."

While Seller objected at trial to this issue, Seller has failed to establish he was prejudiced at trial by Buyers' failure to specifically plead damages from the increased interest rate and, as the evidence below shows, he was clearly able to present evidence at trial to defend against the issue of future interest rate damages. Further, these future interest rate damages logically flow from Buyers' breach of contract claim and pleadings regarding interest rate lock costs.

At trial, evidence was presented tending to establish Seller was on notice for more than two years that Buyers sought to recover damages from the increase in

interest rate. Emails from April 2022 between Puryear and Buyers state that the interest rate available to Buyers had increased to 5.50% and that over "the course of the mortgage term, this [would] result in additional mortgage payments of $306,624.06 . . . [and they] would be willing to close with a seller credit of $300,000.00." Seller was also put on alert in this email chain that the rate lock referred to in the initial and amended complaint had "long since expired." The record shows that Seller was personally copied on these emails. Additionally, Seller's own expert witness on residential mortgages and refinancing was asked on cross-examination "was it obvious to anyone in your industry that interest rates were rising?" He answered, "[i]t would have been obvious to anyone," tending to indicate that Seller likely should have expected these damages regardless of any specific statement of such. Seller also testified to being aware of the fact that interest rates fluctuate.

Based on the pleadings and evidence presented by both parties, the issue of special damages was known by each party and addressed by each party at trial. Therefore, the trial court did not err in awarding special damages.

### 2. *Mitigation of Damages by Buyers*

Seller next argues the trial court erred by awarding damages for the additional interest on their mortgage payments because Buyers failed to mitigate these damages by not closing in April, allowing their 2.99% rate lock to expire, and not obtaining a year-long rate lock. Seller further contends Buyers "did nothing." "The injured party

is required to exercise reasonable diligence to minimize loss. Whether the injured party did exercise *reasonable* diligence to minimize loss is a question for the jury to determine in its consideration of the issue of damages." *Turner Halsey Co. v. Lawrence Knitting Mills, Inc.*, 38 N.C. App. 569, 572, 248 S.E.2d 342, 344-45 (1978). "In reviewing a judgment resulting from a bench trial, the question before this Court is whether competent evidence exists to support the trial court's findings of fact and whether those findings support the trial court's conclusions of law." *Tripps Rests. of N.C., Inc. v. Showtime Enters., Inc.*, 164 N.C. App. 389, 391, 595 S.E.2d 765, 768 (2004) (quoting *Beneficial Mortg. Co. of N.C. v. Peterson*, 163 N.C. App. 73, 75, 592 S.E.2d 724, 726 (2004)). Seller, as the breaching party, has the burden to prove that Buyers, the nonbreaching party, "failed to exercise reasonable diligence to minimize the loss." *Tripps Rests. of N.C.*, 164 N.C. App. at 393, 595 S.E.2d at 768. Seller has failed to meet this burden.

Based on the evidence presented at trial, the trial court found that "[d]ue to [Seller's] breach and associated delays, [Buyers] lost an extremely favorable interest rate from their home mortgage lender, though *[Buyers] acted reasonably* in their efforts and maintained favorable rates following [Seller's] breach." Buyers contend the trial court's finding is supported by competent evidence establishing: (1) they extended their 2.99% rate lock three times prior to its expiration; (2) secured the 5.50% interest rate on 4 May 2022, which was the best available at the time; and (3) extended the 5.50% rate lock multiple times before the sale was ultimately completed.

Further, Buyers contend: (1) they did not refuse to close in April; (2) the expiration of the 2.99% rate lock was out of their control; and (3) all communication between parties at the time was through their realtors. We agree with Buyers that the trial court's finding is supported by competent evidence.

At trial, Buyers testified extensively on direct examination about the reason behind each 2.99% rate lock extension, the decision not to extend the 2.99% rate for the final seven days available to them, and the decision to file a complaint against Seller.[6]

> Q: And at that time did you seek an additional extension?
>
> A: We did not.
>
> Q: And why did you not?
>
> A: Can I back up to the beginning a little bit as far as like - - so we got the 2.99 percent when we signed - - shortly after we signed the contract with [Seller] we got the 2.99 percent. And we did 45 days for the closing, so it was expiring on December 20th.
>
> As I mentioned earlier, at that time we did a seven day rate lock because we believed that with our demand letter that [Seller] would come to the table and we would be able to close. And a seven day was the cheapest option.
>
> We then did a 30 day rate lock on December 27th, 2022, or 2021, because around that same day our attorney was filing our formal complaint within 24 to 48 hours. And we

---

[6] We note that while Jamie Woollens works in commercial lending, she testified that she does not work with home mortgages "at all" and further explained that her knowledge of interest rates has "a lot more to do with [] our borrowing rate versus our risk tolerance versus our competitors' risk tolerance, how badly you want to win a deal. So like the way in which I have to pay close attention to interest rates has nothing to do with the retail mortgage industry."

truly and genuinely believed that this formal complaint would let him know that, "Hey," like "We're very serious. We were not playing around about this. We want to buy this house," like "Please come" - - "Please come to closing."

And so at that point he still did not. And when it got to January 21st and our rate lock was expiring again, this was when I found out that I only had one more 15 day rate lock and then one more seven day rate lock before I could not lock the 2.99 percent rate anymore. So 15 was the maximum I could do at that time. Can I jump ahead to the next one real quick? So - - no.

Q: What happened next?

A: Okay. So this rate expired on or about February 10th. On February 7th we learned that [Seller] was evading service, that he had been - - that the servicer had attempted to serve him for the last month and was unable to. And our attorneys had finally resorted to hiring a private investigator to track him down at a stoplight outside of his office.

We also learned at that time on February 7th-ish that his 30 day clock to respond to that complaint didn't start till he was served, whereas we originally thought that the 30 day clock started when we filed at the end of December.

So at this point we now - - we now have the knowledge that rate locks cannot be extended indefinitely and that [Seller] hasn't been served and his 30 day clock hasn't even started. It makes absolutely no sense to try to hold onto a rate lock at this point, so we let it go so as not to just waste good money.

After consulting with their loan officer and learning more about rate lock options, Buyers entered into their new rate lock on 4 May 2022 at 5.50% for 60 days which left them with an additional 60 days to extend; which they ultimately did. Buyers also testified they did not shop around for another lender, because Guild Mortgage

services their own loans, they had obtained a home loan from them before with the same loan officer, and their loan officer gives them the best possible rates.

Seller argues Buyers failed to mitigate their damages by not obtaining a year-long interest rate lock after realizing the closing was going to be delayed. In making this argument, Seller relies on the testimony of Robert H. Mann, Jr. ("Mann"), who was admitted as an expert witness in the area of residential mortgages and refinancing. At trial, Mann testified that long-term interest rate locks up to 360 days are available to protect home buyers from changes in the market and that they are "common in the industry." However, on cross-examination, Mann testified that 360-day rate locks are "most common for individuals who are buying a home under construction," which Troone House was not, and further that 360-day rate locks are also generally about a half a percent higher than a 60-day rate lock. Additionally, Mann testified that almost all mortgage loans settle without having to extend a rate lock and when asked how far past the closing date he would have recommended to buyers in a similar situation to extend their rate lock had he been the one counseling them he stated, "I'd typically go a week or two just to make sure. You know, on a standard North Carolina sales contract there's a seven day grace period." Buyers' loan officer, Andrew Cody, also testified and stated that Guild Mortgage only offers 360-day rate locks for new construction home loans, therefore, a 360-day rate lock was not available to Buyers.

Based on this evidence, we conclude that the trial court's finding that Buyers

acted reasonably in maintaining a favorable interest rate in their efforts to mitigate their damages is supported by competent evidence. Although we have great sympathy for Seller with the pain and stress he experienced while recovering from his injuries during this transaction, we cannot ignore that at the time of the trial on damages, the trial court already had determined Seller to be liable for breach of contract and that order is not before us on appeal. Further, the record reveals that Seller impeded mitigation of damages himself on multiple occasions. First, the record tends to show that although Seller was injured just days after the Contract was signed, Buyers were unaware of the accident or anything else that might delay closing until the day before the scheduled closing date. Had Seller informed Buyers of his accident immediately, Buyers may have been able to explore other long-term rate lock options. Second, upon finding out Seller was injured, the closing attorney suggested to Seller's realtor they hire a traveling notary so Seller would not have to leave his home to complete the closing documents and to hire a moving company to pack and move his remaining belongings as Troone House was no longer his primary residence. Third, although Seller testified he went back to work part-time around 15 or 16 February 2022, he did not reach out to Buyers that he was ready to proceed again until April. Fourth, the trial court found that Seller "had previously bought and sold real property, acquired and refinanced loans for real property and utilized financial services to do so, and was aware delays could negatively impact a loan obtained by a purchaser."

While Buyers and Seller both could have taken additional steps to ultimately mitigate the damages Buyers incurred, the question before the trial court was whether Buyers acted reasonably in their efforts to mitigate damages, not whether Buyers exhausted every possible avenue to mitigate damages. *See Turner Halsey Co.*, 38 N.C. App. at 572, 248 S.E.2d at 344-45. Therefore, the trial court did not err by awarding damages for the additional interest on their mortgage payments. *See Starling v. Sproles*, 69 N.C. App. 598, 605, 318 S.E.2d 94, 98 (1984) (concluding that it was not a failure to mitigate damages due to "plaintiffs' failure to secure an 8¾% loan elsewhere").

**C. Buyers' Arguments**

Buyers argue the trial court erred by concluding future mortgage loan interest rate damages are too speculative. Additionally, Buyers argue that by failing to award future interest damages and damages to compensate for physical damage done to Troone House during the delay in closing, the trial court failed to effectuate the remedy of specific performance.

### 1. *Future Interest Rate Damages*

Buyers argue the trial court erred by concluding future damages caused by the increased interest rate on the mortgage loan are too speculative to award. Specifically, Buyers argue there was no speculation required to determine the difference between the interest costs they would have incurred if they closed on schedule and the actual interest costs they are incurring and going to incur with the

increased interest rate.

In contrast, Seller argues the trial court erred by awarding *any* damages to Buyers for the increased interest rate. Specifically, Seller argues that Buyers failed to provide evidence of what their damages were and that Buyers should have obtained a longer rate lock to mitigate their damages. Seller asserts that Buyers "were the master of their own destiny" as they "chose how much to borrow from whom, when, and at what interest rate." Further, Seller contends Buyers made a cash offer on Troone House, thus, he is not responsible for loan related damages.

Parties entered into the Contract for the conveyance of real property, Troone House. The trial court, in its prior order, found that specific performance was an appropriate remedy given the nature of the Contract and the breach. Thus, Seller was ordered to specifically perform the Contract by completing the sale of Troone House. In a separate trial almost two years later, the trial court considered what damages Buyers may be entitled to from Seller's breach of the Contract. While no interest rate was set forth as a condition to the sale in the Contract, the Contract is clear that Buyers intended to obtain a mortgage loan for the purchase of Troone House. The trial court found as a consequence of the breach, Buyers incurred a higher interest rate on their mortgage loan and were entitled to damages as a result. The trial court awarded Buyers damages in the amounts of $27,806.17 for the additional

interest paid up to the date of the damages trial and $8,216.20 for reduced equity[7] in Troone House; however, the trial court concluded as a matter of law that "damages regarding future interest are too speculative" to award. We disagree.

"The party seeking damages bears the burden of proving them in a manner that allows the fact-finder to calculate the amount of damages to a reasonable certainty." *State Props., LLC v. Ray*, 155 N.C. App. 65, 76, 574 S.E.2d 180, 188 (2002). While the party claiming damages "must present relevant data providing a basis for a reasonable estimate, proof to an absolute mathematical certainty is not required." *Id.* Stated differently, "a party seeking recovery for losses occasioned by another's breach of contract need not prove the amount of his prospective damages with absolute certainty; a reasonable showing will suffice. Substantial damages may be recovered, though plaintiff can only give his loss proximately." *Pipkin v. Thomas & Hill, Inc.*, 298 N.C. 278, 287, 258 S.E.2d 778, 785 (1979) (cleaned up).

For the reasons stated below, we conclude Buyers met their burden by providing the trial court a manner by which "to calculate the amount of [future] damages to a reasonable certainty" resulting from the increased interest rate. Thus, future damages are not too speculative to award. *See State Props.*, 155 N.C. App. at 76, 574 S.E.2d at 188.

Buyers presented the following evidence to support their request for future

---

[7] In the case *sub judice* when referring to equity, we are referring to the amount of money paid towards the principal balance of the mortgage loan.

damages resulting from the increased interest rate: closing disclosures with the initial 2.99% interest rate; closing disclosures with the current 5.50% interest rate; amortization tables detailing a 30-year fixed-rate mortgage loan at 2.99% and 5.50%; testimony from Buyers' loan officer about the ability to "recast" their mortgage loan after a lump sum payment is made and how it would reduce their monthly payment; and testimony that at the time of the damages hearing refinancing their mortgage loan was not practicable because current interest rates were even higher than 5.50%. This evidence supported the amount of additional interest Buyers had paid up to the point of the hearing and the additional future interest they would pay over the life of their loan. The trial court's language in its findings further supports that Buyers' evidence demonstrated a "reasonable showing" of the amount of future damages as it was found Buyers "*would* pay a total of $306,624.06 in additional interest" and a lump sum payment "*would* result in the remaining monthly payments being equal to the exact amount that the monthly payments would have been had [Seller] not breached."

Seller at trial relied on *Watts v. North Carolina Department of Environmental & Natural Resources* as grounds to find the future interest rate damages too speculative. However, Buyers on appeal discuss *Watts* to support their contention that these damages are *not* too speculative. In *Watts*, this Court considered the damages available to a plaintiff after the North Carolina Department of Environmental and Natural Resources ("NCDENR") negligently issued an improvement permit to them for land they purchased. *Watts v. N.C. Dep't of Env't &*

*Nat. Res.*, 182 N.C. App. 178, 179, 641 S.E.2d 811, 814 (2007). In reliance on the improvement permit issued to them, plaintiffs began to develop the land, however, construction was delayed when it was revealed the land did not actually pass the perk test and the permit issued was revoked. *Id.* at 184, 641 S.E.2d at 817. Plaintiff presented testimony that they qualified for financing at an interest rate of approximately 5.44% on a 30-year fixed-rate mortgage in 2002 when they began to pursue development of the land prior to discovering the permit had been negligently issued. *Id.* at 179, 641 S.E.2d at 814. The trial court made a finding that due to NCDENR's negligence delaying construction, plaintiff would incur "an increased interest rate of at least 1.5% over the term of its loan [and the] cost of this 1.5% increase in interest is $174,745.54." *Id.* at 185, 641 S.E.2d at 818. NCDENR argued on appeal that the trial court's conclusion awarding $174,745.54 in future interest damages was not supported and the damages were too speculative to award. *Id.* This Court agreed with NCDENR and found future interest rate damages were too speculative to award based on the facts and circumstances specific to that case and reasoned:

> The future interest damages included in the Commission's award are uncertain, speculative, and too remote to be recoverable. The figure for future interest damages was calculated based on financial data about projected interest rates, the anticipated number of years over which the loan would accrue interest, and the type of loan (fixed, as opposed to variable). The numbers further depend on plaintiff completing construction of the home on time and according to schedule.

*Id.* at 186, 641 S.E.2d at 818.

In contrast to *Watts*, the future damages calculation attributable to the interest rate increase from 2.99% to 5.50% in the case *sub judice* is *not* projected, the number of years over which the loan would accrue is *not* anticipated, and the figures *do not* depend on completion of construction. Had the closing occurred on schedule, Buyers would have a 30-year fixed-rate mortgage loan with a 2.99% interest rate. Because of the delay in closing, Buyers have a 30-year fixed-rate mortgage loan with a 5.50% interest rate. The evidence provided tends to demonstrate with more than a reasonable certainty what Buyers' future interest rate damages will be, unlike the concerns this Court had regarding the future interest rate damages award in *Watts*.

In *Starling v. Sproles*, this Court contemplated the damages for a breach of contract when plaintiffs purchased a home with an assumable mortgage loan where the purchase contract stated an 8.75% interest rate, when in reality the interest rate increased to 9.50%. *Starling*, 69 N.C. App. at 598-99, 318 S.E.2d at 94. This Court agreed with the plaintiffs that the correct method for computing the damages caused by an increase in interest rate was set forth by our Supreme Court in *Pipkin v. Thomas & Hill*; however general principles of contract law may also guide the determination. *Id.* at 602, 318 S.E.2d at 96. *Pipkin* concluded "that the measure of damages for a breach of contract to borrow money is the present value of the difference between the interest payments owed at the interest rate specified in the contract, and the interest payments actually owed as a result in the breach." *Id.* at

603, 318 S.E.2d at 97 (summarizing *Pipkin v. Thomas & Hill's* conclusion on

measurements of damages involving interest rates). Therefore, under the principles

set forth in *Sparling* and *Pipkin*, it is not too speculative to award Buyers the present

value difference in interest cost at the interest rate available at the initial closing

date and the interest cost at the interest rate ultimately obtained at closing.

Next, we address the trial court's apparent basis for its conclusion that

"damages regarding future interest are too speculative." The trial court orally

reasoned:

> If I'm allowed to use common sense, I would say that very few people at their age buy a house and stay there for 30 years. It doesn't happen. And don't look at me like that. You know it's true. I mean you can give me the weird look all you want, but the bottom line is people that age move.
>
> They find better neighborhoods. They decide to build a house. There's a better school district. I mean it just happens. It's not a criticism. It's just fact, okay? And I know that's speculative, but it's no more speculative than saying that they're going - - that I should award them 30 years worth of interest or an amount to pay their loan down if we pay it down for 30 years.
>
> So that's the position I find myself in is - - is figuring out what is fair to them and equitable to them and what is fair to [Seller] as well, that will make them - - that will reasonably compensate them for what they've gone through without providing a windfall and without punishing [Seller] because you can't punish for breach of contract. Breach of contract is damages, actual damages, okay?

In *Pipkin v. Thomas & Hill*, our Supreme Court affirmed that when calculating

damages in a breach of contract case involving a loan commitment and increased interest rate, damages should not be reduced for the likelihood of early repayment when no evidence has been presented that the plaintiffs contemplated early repayment of the loan. *Pipkin*, 298 N.C. at 288, 258 S.E.2d at 785.  The trial court found "[Buyers] testified that [Troone House] was intended to be [Buyers'] 'forever home,' but also testified that [Buyers] have sold two houses in three years."  While this finding is supported, there was no evidence presented and no written finding made by the trial court that Buyers contemplate early repayment of the loan.

Buyers testified extensively about the reason they wanted to purchase Troone House specifically and their plans for it to be their "forever home."  At the time parties entered into the Contract, Buyers were living in Wilmington; after finding out they were expecting their first child, Buyers decided to move back to Raleigh, close to their family and friends.  Buyers testified they "fell in love" with Troone House because of its layout and location, and further explained,

> it's a corner cul-de-sac.  Like it's in the back of the cul-de-sac, so it's a big, wide lot.  And we had a vision for beautiful things that we could do to the yard and house . . . the layout of it was perfect for our family plans.  We wanted two kids . . . it just made a lot of sense for us, not only the location for - - we're close to the day care that we wanted.  It's close to the interstates for me traveling back and forth to Wilmington occasionally for work, and Nate goes back and forth to Kannapolis occasionally for work.  We're close to the airport.  It just worked out perfect for our lives and what they - - what our demands are.

Further, Buyers testified they "don't have any plans to leave anytime soon."  They

further testified they chose Troone House due to its close proximity to their day care, desired school, and closest friends.

While Seller's expert witness did testify that, "studies have shown that most people will keep their mortgage somewhere between seven to ten years," this testimony is not evidence that *Buyers* contemplate early repayment of their loan. Additionally, our Supreme Court's holding in *Pipkin* makes it clear that the fact that Buyers have sold homes in the recent past and have the ability to sell Troone House prior to the expiration of the mortgage does not warrant a reduction of award due to a likelihood of early repayment. *Pipkin*, 298 N.C. at 288, 258 S.E.2d at 785.

Buyers, in the alternative to asking for the entire $306,624.06 in future interest damages, presented additional evidence to show the impact of a large lump sum payment to their loan at the increased interest rate. Buyers' loan officer testified at trial about the ability to "recast" their loan after a large lump sum payment is made. Recasting after the lump sum payment would recalculate Buyers' set monthly principal and interest ("P&I") payment, effectively lowering it for the remainder of the loan term. The evidence presented by Buyers and their loan officer showed that a $145,854.19 payment made before the October 2024 monthly payment would allow them to recast their loan and reduce their set monthly P&I payment to an amount almost equal to what their set monthly payment would have been at the initial interest rate without changing the interest rate or refinancing their current loan. This lump sum payment is less than the total difference in amount of total interest

cost at each interest rate. We hold a lump sum payment to allow the recasting of Buyers' loan would be the appropriate award of damages as it reduces the potential for a windfall.

However, as Seller correctly notes, under the terms of the Contract, Buyers were to obtain a loan in the principal amount of "80% LTV," or $516,000.00 considering the purchase price of $645,000.00. Despite the terms set forth in the Contract, Buyers ultimately obtained a loan in the principal amount of 90% LTV or $580,500.00 as reflected in their closing documents and amortization tables presented at trial. Thus, while Buyers have met the burden of showing with reasonable certainty what their damages and future damages are, their damages are calculated on an incorrect principal loan amount. The award of damages must be calculated to reflect the increased interest costs associated with a principal loan amount of 80% LTV or $516,000.00 as set forth in the Contract.

In sum, Buyers' damages resulting from the increased interest rate shall be awarded based on a principal loan amount of 80% LTV or $516,000.00. The consequential damages awarded to Buyers for additional interest paid and reduced equity shall be reduced to reflect calculation from the appropriate principal loan amount of $516,000.00. To reduce potential windfall, a lump sum payment for future damages resulting from the increased interest rate to allow Buyers the ability to recast their loan is a more appropriate award in lieu of the difference in total interest to be paid over the term of the loan. The lump sum payment amount shall be

calculated based on the difference in monthly P&I payments for an initial principal loan amount of $516,000.00. Buyers are entitled to a lump sum payment that allows them to reduce their monthly payment no more than the difference in monthly P&I payments for a $516,000.00 loan at 2.99% and 5.50% interest.

## 2. *Damages for Physical Damage to Troone House*

Next, Buyers argue the trial court erred by declining to award damages for the physical damages to Troone House that did not exist at the time of the initial closing date. The trial court concluded "that [Buyers'] damages due to damage to [Troone House] between the time of the inspection prior to the original closing date and the date of closing are not permitted." We agree recovery for these damages is not permitted.

While Buyers testified at trial about the damage to Troone House they contend was not present during their inspections prior to the initial closing date, the Contract explicitly states, "Buyer acknowledges and understands that unless the parties agree otherwise, THE PROPERTY IS BEING SOLD IN ITS CURRENT CONDITION" and further down on the same page, "CLOSING SHALL CONSTITUTE ACCEPTANCE OF THE PROPERTY IN ITS THEN EXISTING CONDITION UNLESS PROVISION IS OTHERWISE MADE IN WRITING."

"'Interpreting a contract requires the court to examine the language of the contract itself.' When the terms of a contract are 'plain and unambiguous, there is no room for construction. The contract is to be interpreted as written.'" *Benigno v.*

*Sumner Constr., Inc.*, 278 N.C. App. 1, 5, 862 S.E.2d 46, 50 (2021) (quoting *State v. Philip Morris USA, Inc.*, 363 N.C. 623, 631, 685 S.E.2d 85, 90 (2009); *Jones v. Casstevens*, 222 N.C. 411, 413, 23 S.E.2d 303, 305 (1942)).

Based on the plain language of the contract terms, Buyers accepted the property "IN ITS THEN EXISTING CONDITION" when they closed on Troone House on 1 September 2022. Therefore, the trial court did not err by concluding damages were not permitted for property damage occurring before closing.

### 3. *Failure to Effectuate Remedy of Specific Performance*

Lastly, Buyers argue the trial court failed to effectuate the remedy of specific performance by refusing to award future interest rate damages and damages for the physical damage to Troone House caused by the delay in closing. By not awarding these damages, Buyers contend they have not been returned to the position they would have been in had Seller not breached the Contract. As we have already determined the trial court erred by concluding the future interest rate damages are too speculative to award, we decline to address this argument as it is moot.

Additionally, we note that the trial court's prior order entered on 30 August 2022 granting partial summary judgment and ordering specific performance explicitly stated specific performance shall be fulfilled by completing the transfer of Troone House:

> 2) That [Seller] shall specifically perform the contract *by delivering to [Buyers] or their designated agent a properly executed deed for [Troone House] and other associated*

*documents necessary to affect the transfer of [Troone House] to [Buyers]*;

. . .

4) That the issue of damages to which [Buyers] may be entitled is expressly reserved for future proceedings and decision of this court.

The trial court left the issue of monetary damages to be determined *separate* from its order of specific performance. By completing the sale of Troone House, specific performance, defined as "an equitable remedy which compels the performance of a *contract*," was fulfilled as the trial court's order "compel[led] the parties to do the very things they have *agreed* to do," i.e., complete the sale of Troone House to Buyers. *See Condellone v. Condellone*, 129 N.C. App. 675, 684, 501 S.E.2d 690, 696 (1998); *Munchak Corp. v. Caldwell*, 301 N.C. 689, 694, 273 S.E.2d 281, 285 (1981) (stating specific performance is available "to compel a party to do precisely what he ought to have done without [being] coerced by the court."). The direct, incidental, and consequential damages *resulting* from the breach of contract considered in the 8 October 2024 judgment on appeal are separate issues from specific performance.

## III.    Conclusion

For the reasons stated herein, the trial court erred by concluding future interest rate damages are too speculative based on the evidence presented. The trial court did not err by concluding Buyers are not entitled to an award of damages for physical damage to Troone House. The trial court did not err by awarding damages

for the increased interest paid up to the date of trial; however, the trial court did err in its calculation of the amount awarded for the increased interest rate damages paid up to the date of trial. Thus, this matter is remanded to the trial court for a recalculation of damages consistent with this opinion.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

Judge FREEMAN concurs.

Judge TYSON concurring in part and dissenting in part by separate opinion.

TYSON, Judge, concurring in part, dissenting in part.

I concur with the portion of the majority's opinion, which holds Buyers' recovery for damages to the property between the time of the inspection prior to the original closing date and the closing date are not recoverable. I also concur with the portion of the majority's opinion, which holds the direct, incidental, and consequential damages resulting from the breach of contract are separate issues from specific performance, and I vote to overrule Buyers' argument the trial court failed to effectuate the remedy of specific performance by refusing to award future mortgage interest damages and compensation for damage done to the property.

I respectfully dissent from the portions of the majority's opinion which hold: Buyers sufficiently pled the issue of special damages under Rule 9(g); the trial court did not err by awarding Buyers damages for additional interest expenses on their mortgage; and, the trial court erred by failing to award speculative future interest expenses to Buyers.

## IV.   Seller's Arguments

### D. Pleading

The majority's opinion holds Buyers sufficiently pled the issue of special damages to permit the trial court to consider and award consequential damages in the amount of $27,806.17 from additional interest Buyers had already paid due to Seller's breach, and consequential damages of $8,216.20 for reduced equity in the

property. I disagree.

Buyers filed their Complaint on 6 January 2022. The Complaint alleges Buyers had incurred expenses from additional storage fees, rate lock extension fees, additional moving and storage expenses, and attorneys' fees. Buyers filed an amended Complaint on 11 March 2022, which did not allege any additional damages.

"When items of special damage are claimed each shall be averred." N.C. Gen. Stat. § 1A-1, Rule 9(g) (2025). "Special damages must be specifically pleaded and proved and the facts giving rise to the special damages must be sufficient to inform the defendant of the scope of plaintiff's demand." *Johnson v. Bollinger*, 86 N.C. App. 1, 11-12, 356 S.E.2d 378, 385 (1987) (citing *Gillespie v. Draughn*, 54 N.C. App. 413, 417, 283 S.E.2d 548, 552, *disc. rev. denied*, 304 N.C. 726, 288 S.E.2d 805 (1982)).

"Special damages are those which are the actual, but not the necessary, result of the injury complained of, and which in fact follow it as a natural and proximate consequence in the particular case, that is, by reason of special circumstances or conditions. Hence general damages are such as might accrue to any person similarly injured, while special damages are such as did in fact accrue to the particular individual by reason of the particular circumstances of the case." *Penner v. Elliott*, 225 N.C. 33, 35, 33 S.E.2d 124, 125-26 (1945) (citation omitted).

The additional interest incurred as a result of the breach falls squarely within the definition of "special damages," and neither Buyers nor the majority's opinion

assert otherwise. Instead, the majority's opinion relies on Rule 15(b) to side-step the clear and unambiguous pleading requirement. The Rule provides, "[w]hen issues not raised by the pleadings are tried by the express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." N.C. Gen. Stat. § 1A-1, Rule 15(b) (2025). Here, the issue of special damages from the increased interest rate was not tried upon the consent, express or implied, of the parties. *See id.* In fact, Seller entered a standing objection to the introduction of evidence of those damages because they were not pled N.C. Gen. Stat. § 1A-1, Rule 9(g) (2025).

Rule 15 provides further, "If evidence is objected to at the trial on the ground that it is not within the issues raised by the pleadings, the court may allow the pleadings to be amended[,]" so long as the objecting party is not prejudiced by the amendment. N.C. Gen. Stat. § 1A-1, Rule 15(b). The trial court never permitted an amendment to the pleadings. As the majority's opinion concedes, Buyers made a motion to amend at trial and the court "took it under advisement," but never explicitly ruled on it.

The majority's opinion asserts the trial court effectively ruled upon the motion because it proceeded to award special damages. Even if this was true, the application of Rule 15 fails because Seller was undoubtedly prejudiced. *See id.* Interest rate expenses can become complicated, and these damages should have been specifically pled to put Seller on notice of the scope of Buyers' demand. *Johnson*, 86 N.C. App. at

11-12, 356 S.E.2d at 385. I vote to hold the trial court erred by considering and ruling upon the issue of interest rate expenses when these special damages were not pled.

### E. Mitigation of Damages

I also disagree with the majority's holding the evidence fails to show Buyers did not adequately attempt to mitigate their damages from the increased interest rate. The evidence shows Seller suffered a broken pelvis prior to the scheduled closing date, which required surgery and a hospital stint of several weeks. The contract established a closing date of 17 December 2021. On 16 December 2021, Seller emailed his Realtor® describing the extent of his injuries, and that he was not prepared to close the transaction. When Buyers received the email from Seller they proceeded with litigation to compel specific performance.

On 24 December 2021, Seller offered Buyers $15,000 to terminate the contract, which Buyer refused. Buyer filed suit on 6 January 2022. Buyers were aware interest rates were rising in early 2022, and they obtained a rate lock that extended until sometime in February 2022. On 30 March 2022, Seller made Buyer a second offer of $50,000 to terminate the contract, which Buyer refused.

On 13 April 2022, Attorney PJ Puryear, on behalf of Seller, emailed Buyers' attorney informing Seller was ready to proceed with the closing. Mr. Puryear asked Buyers' attorney what the costs of the delay were so Seller could consider them as part of the closing. Buyers' attorney responded they would only close with a

demanded $300,000 credit against the purchase price due to the purported increased interest rate on their mortgage loan, which Seller declined. At trial, Buyers testified they could have proceeded with the closing in April. Buyers had already filed their Complaint. The Complaint sought specific performance and damages for moving and storage expenses, the rate lock fees, and attorneys' fees. Seller was attempting to accommodate their stated demands.

"The general rule is that where there has been a breach of contract, the injured party must do 'what fair and reasonable prudence requires to save himself and reduce the damage; or the damage which arises from his own neglect will be considered too remote for recovery." *Halsey Co. v. Knitting Mills*, 38 N.C. App. 569, 572, 248 S.E.2d 342, 344 (1978) (quoting *Little v. Rose*, 285 N.C. 724, 728, 208 S.E.2d 666, 669 (1974)) (citation omitted).

I disagree with the trial court's asserting Buyers had "acted reasonably in their efforts to obtain and maintain favorable rates following [Seller's] breach." Buyer Jamie Woollens, who is employed in commercial lending, testified Buyers extended the rate lock in January 2022, and once again thereafter. After that, they "only had one seven day extension that [they] chose not to take." The rate lock expired some time in February. Seller was not informed of the expiration of the rate lock until 26 April 2022.

Seller presented testimony from Robert H. Mann, Jr., a home lending advisor

with over thirty years' experience in the residential mortgage industry. Mr. Mann testified it was "obvious to anyone" mortgage rates were rising in late 2021 and early 2022. Mr. Mann testified long-term interest rate locks were available to protect home buyers from increased rates during that time, and those rate locks were available with 360 day terms. He further testified 360 day rate locks are "common in the industry," and Buyers "could have gone through almost any lender to make that request." Buyers' mortgage lender was a friend. They never consulted with any other mortgage lenders about an interest rate or attempted to obtain a long-term rate lock.

I vote to hold the trial court erred by awarding Buyers $27,806.17 in additional interest and $8,216.20 in purported reduced equity, because Buyers failed to mitigate their damages by: (1) refusing to close in April; (2) not informing Seller of the pending expiration of the rate lock and permitting him a chance to act prior its expiration; (3) failing to investigate the possibility of a longer rate lock; and (4) failing to obtain any information from additional mortgage lenders.

## V.    Buyer's Argument – Speculative Damages

The majority's opinion asserts "it is not too speculative to award Buyers the present value difference in interest cost at the interest rate available at the initial closing date and the interest cost at the interest rate ultimately obtained at closing." I disagree with the majority's opinion and vote to uphold the trial court's conclusion, which prohibits the award of damages for the speculative future interest expense.

Buyers had secured an interest rate of 2.99% when the parties went under contract. Unrefuted testimony showed there was no impediment to closing in April. Buyers testified they did not know what their interest rate would be had they closed in April, and no evidence was presented regarding interest rates in April.

When the transaction was closed in September of 2022, the interest rate on the Buyers' loan was 5.50%. Buyers presented evidence to show they would pay a total of $306,624.06 more over the lifetime of their loan than if they had closed on the contracted closing date in December, or a reasonable time thereafter.

Initially, for the reasons set forth above, the trial court cannot permit future purported interest expenses where Buyers clearly failed to act reasonably to mitigate their damages. The law is clear that "'[d]amages which are uncertain and speculative . . . are too remote to be recoverable.'" *Watts v. N.C. Dep't of Env't & Nat. Res.*, 182 N.C. App. 178, 186, 641 S.E.2d 811, 818 (2007) (quoting *Johnson v. Atlantic Coast Line R.R. Co.*, 184 N.C. 101, 105, 113 S.E. 606, 608 (1922)). The burden is on the party seeking damages to prove them "in a manner that allows the fact-finder to calculate the amount of damages to a reasonable certainty." *State Props., LLC v. Ray*, 155 N.C. App. 65, 76, 574 S.E.2d 180, 188 (2002) (citation omitted).

Buyers are seeking interest payments, which will not become due, if ever, for decades. Mr. Mann's testified "[s]tudies have shown that most people will keep their mortgage somewhere between seven to ten years." Families commonly buy and sell

7

homes as their children grow and circumstances change. Countless factors cause families to sell their home and move. It is uncommon for a newly-married couple to remain in the same home for the entire lifetime of a mortgage.

There is also the possibility Buyers will refinance the loan in the future. To award Buyers damages for future interest expenses would create a windfall at the expense of Seller should Buyer sell or refinance, which is the rationale for why the law prohibits the award of future, speculative damages. I vote to affirm the trial court, which properly concluded the Buyers' purported damages regarding future interest expenses are too speculative to award.

## VI. Conclusion

I concur with the majority's opinion holding Buyers' purported damages between the time of the inspection prior to the original closing date and the closing date are not recoverable, and the direct, incidental, and consequential damages resulting from the breach of contract are separate issues from specific performance. I also vote to overrule Buyers' assertion the trial court failed to effectuate the remedy of specific performance by refusing to award future mortgage interest damages and compensation for damage done to the property.

I vote to reverse the trial court's award of special damages because Buyers failed to plead special damages and respectfully dissent. I also vote to reverse the trial court's award of consequential damages for additional interest paid by Buyers

due to Sellers breach and reduced equity in the property, because the unrefuted evidence shows Buyers failed to reasonably mitigate their damages and respectfully dissent. I also vote to affirm the trial court's refusal to allow Buyers' to recover future interest expenses from Seller because they are too speculative to award.